**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 4, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RICKY LEE THOMAS,

      Plaintiff - Appellee,

v.

JOHN DURASTANTI,

      Defendant - Appellant.

No. 07-3343

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 6:06-CV-01224-MLB-KMH)**

Thomas G. Luedke, Assistant United States Attorney (Eric F. Melgren, United
States Attorney, and Marietta Parker, Acting United States Attorney, with him on
the briefs), Topeka, Kansas, for Defendant-Appellant.

Timothy W. Monsees, of Monsees, Miller, Mayer, Presley & Amick, P.C., Kansas
City, Missouri, for Plaintiff-Appellee.

Before **KELLY, EBEL** and **GORSUCH**, Circuit Judges.

**KELLY**, Circuit Judge.

In this interlocutory appeal, Defendant-Appellant John Durastanti, an agent

with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"),

appeals the district court's decision denying him qualified immunity from

Plaintiff-Appellee Ricky Lee Thomas' claim that Agent Durastanti violated Mr. Thomas' Fourth Amendment right to be free from unreasonable seizures when Agent Durastanti shot Mr. Thomas. In an interlocutory appeal from the denial of qualified immunity, this court's jurisdiction is limited to considering only legal questions. With that in mind, our jurisdiction arises under 28 U.S.C. § 1291. We rely upon facts established by a video capturing much of the event together with Plaintiff's version of the remaining facts. We hold that a reasonable officer could have reacted in the manner Agent Durastanti did, and therefore he is entitled to qualified immunity. Accordingly, we REVERSE.

## I.    BACKGROUND

"The first step in assessing the constitutionality of [Agent Durastanti's] actions is to determine the relevant facts." Scott v. Harris, 550 U.S. 372, 378 (2007). The parties tell very different versions of the events surrounding the shooting. But in reviewing the district court's decision to deny Agent Durastanti summary judgment on qualified immunity grounds, we must "view the facts and draw reasonable inferences in the light most favorable to [Mr. Thomas,] the party opposing the summary judgment motion." Id. (quotation omitted). An appellate court lacks jurisdiction in an interlocutory qualified immunity appeal to resolve genuine disputes of fact. Behrens v. Pelletier, 516 U.S. 299, 312-13 (1996); Johnson v. Jones, 515 U.S. 304, 313-18 (1995). However, even if the district court concludes that controverted issues of fact remain, an appellate court may

2

consider the legal question of whether the defendant's conduct, taken as alleged by the plaintiff, violates clearly established law. Behrens, 516 U.S. at 312-13.

As noted, there is a video recording of a significant part of the incident at issue here. While a court considering a summary judgment motion based upon qualified immunity "usually" must "adopt[] . . . the plaintiff's version of the facts," that is not true to the extent that there is clear contrary video evidence of the incident at issue. Scott, 550 U.S. at 378-80 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); see also Thomson v. Salt Lake County, 584 F.3d 1304, 1312 (10th Cir. 2009). We rely on that video evidence here, while acknowledging that it did not capture everything. Therefore, in addition to relying on the video, we also continue to view the evidence in the light most favorable to Mr. Thomas.[1] See York v. City of Las Cruces, 523 F.3d 1205, 1210-11 (10th Cir. 2008) (applying Scott to an audiotape of the challenged incident).

Viewed in that light, the evidence[2] establishes the following:

---

[1] Here, as in Scott, "[t]here are no allegations or indications that [the] videotape" of the incident in question "was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." Scott, 550 U.S. at 378.

[2] Before the district court, Agent Durastanti challenged the evidence that

(continued...)

3

Mid-afternoon on January 13, 2006, Agent Durastanti, accompanied by his partner, Agent Stephen Thompson, both dressed in plain clothes, were in an unmarked sport utility vehicle ("SUV") driving around Wichita, Kansas, looking for a fugitive. As they did so, the agents noticed a white Lincoln town car speeding toward them and away from what the agents deemed to be a high crime area. The Lincoln did not have a license plate in its tagwell. The agents decided to follow the Lincoln.

The Lincoln stopped at a house a few blocks away, where one of the three occupants ran inside for a brief moment and then returned to the car, which immediately left. By this time, Agent Durastanti noticed that, while the car did not have a regular license plate, it did have a dealer tag. When Agent Durastanti called a dispatcher to check the registration number on the dealer tag, however, the dispatcher informed him that the registration was "not in file." Aplt. App. 103. Suspecting the Lincoln's occupants were up to no good, the agents continued to follow the car, and Agent Durastanti called for a uniformed officer to pull over the Lincoln. Kansas State Trooper Tom Spencer responded.

The three men in the car—driver Almario Smith, his brother, Plaintiff Ricky Lee Thomas, and a friend, Keith Jones—were actually test-driving the Lincoln, with the permission of the dealership that owned the car. All three men

---

[2](...continued)
Mr. Thomas submitted in response to Agent Durastanti's summary judgment motion. However, he does not reassert those arguments now on appeal.

4

concede that Mr. Smith was speeding, but Mr. Thomas and Mr. Jones contend that Mr. Smith was not otherwise driving erratically. The three men stopped at Mr. Smith's mother's house to see if she was home so Mr. Smith could show her the car. Not finding her at home, the trio left her house soon after arriving. At the time they left Mr. Smith's mother's home, Mr. Smith was driving, Mr. Thomas was in the front passenger seat, and Mr. Jones was in the back seat. Using the freeway, Mr. Smith drove to a Valero gas station/convenience store so Mr. Jones could use the restroom and buy a pack of cigarettes.

The state trooper, the two ATF agents, and the Lincoln all arrived at the gas station at about the same time. Mr. Smith entered the parking lot approximately ten seconds ahead of both the state trooper and the ATF agents. The parking lot was busy and there were few parking spots open. Mr. Smith stopped the Lincoln parallel to the convenience store, not in a designated parking space but between the two driveways that led from the parking lot back onto the street from where the Lincoln had just come. The ATF agents entered the parking lot using the driveway that was directly in front of the Lincoln and parked facing the Lincoln, partially blocking the driveway that was the Lincoln's most natural path out of the lot. The state trooper activated all of his emergency lights as he turned into the gas station, entered the parking lot through the driveway behind the Lincoln and parked a car's length behind and at an angle to the Lincoln.

The ensuing events occurring in the convenience store parking lot lasted

5

approximately thirty-seven seconds. After the Lincoln stopped, Mr. Jones, who was in the back passenger seat, started to get out of the car to go inside the store when he noticed two men approaching with guns drawn and pointed at the Lincoln—the ATF agents, dressed in plain clothes and giving no indication that they were police officers. It is undisputed that Agent Durastanti never identified himself as a police officer. And, although Agent Thompson asserted that he yelled "police," the men in the Lincoln never heard it.

The two armed approaching men, Agents Durastanti and Thompson, yelled for Mr. Jones to get back inside the car. At the same time, the state trooper, who had parked his marked patrol car, with its emergency lights activated, behind the Lincoln, partially exited his patrol car and yelled: "Have a seat in the car. Have a seat in the car." Video at 15:15:34-36. The trooper then yelled at the occupants of the Lincoln to put their hands where the trooper could see them. Mr. Jones reentered the Lincoln. All of this was visible to Agent Durastanti including the trooper's marked patrol car, emergency lights, and Mr. Jones' apparent compliance.

Once he reentered the Lincoln, Mr. Jones alerted Mr. Smith and Mr. Thomas about the two approaching armed men. Mr. Thomas feared that the two men intended to rob the Lincoln's occupants or otherwise harm them. According to Mr. Jones and Mr. Thomas, none of the men in the Lincoln noticed the state trooper behind them; Mr. Thomas finally saw the trooper when Mr. Thomas

6

looked back for an escape route away from the two armed men approaching the Lincoln. But he did not have time to tell Mr. Smith, who was driving the Lincoln, about the trooper.

In an effort to get away, Mr. Smith began to drive the Lincoln out of the parking lot, maneuvering around the ATF agents' SUV, which was partially blocking the Lincoln's path. Agent Thompson, who was approaching the driver's side of the Lincoln, had to move out of the way of the Lincoln; as he did so, Agent Thompson hit the Lincoln's front passenger window with the butt of his weapon, trying to break the glass. Agent Durastanti proceeded from the driver's side of the agents' SUV toward the rear of that vehicle and into the path of the Lincoln as it headed around the agents' SUV toward the parking lot exit. Agent Durastanti would testify later that he was concerned that Agent Thompson was in distress, that the Lincoln was coming directly at him and his objective was to stop the Lincoln. Aplt. App. 114-115. Agent Durastanti fired several shots at the driver. The Lincoln, nevertheless, continued out of the parking lot, hitting Agent Durastanti, who rolled off its hood, landed on his feet, turned around and then fired two more shots at the back of the Lincoln as it proceeded down the street away from the Valero station. The state trooper and Agent Thompson gave chase. During the chase, the state trooper observed the driver open the door of the Lincoln and discard a plastic bag onto the street. Ultimately, the Lincoln stopped a few blocks away. Mr. Smith had been shot in the head; Mr. Thomas had

suffered a gunshot wound to his leg.

A search of the Lincoln and its occupants revealed no weapons. Mr. Smith, the Lincoln's driver, later pled guilty to two counts of assaulting a federal officer and, in doing so, admitted that he had driven at the agents as he drove out of the convenience store parking lot. The Lincoln's occupants had been transporting crack cocaine for a planned sale. No criminal charges were brought against either passenger.

Mr. Thomas sued both ATF agents, Durastanti and Thompson, under Bivens,[3] and Kansas State Trooper Thomas Spencer and the Kansas State Highway Patrol under 42 U.S.C. § 1983. Agent Thompson, Trooper Spencer, and the Kansas Highway Patrol have now been dismissed, so Agent Durastanti is the only remaining defendant. Agent Durastanti moved to dismiss, or for summary judgment, asserting that he was entitled to qualified immunity. The district court treated that motion as one for summary judgment and denied it finding it a "close question" whether a jury could find Agent Durastanti's actions objectively unreasonable.[4] Aplt. App. 783. Agent Durastanti immediately took this interlocutory appeal.

---

[3] Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 389 (1971) (recognizing claim for damages against federal agents alleged to have violated the Fourth Amendment).

[4] Given that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986), such a "close call" would favor a successful qualified immunity defense.

## II.    JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1291 to consider Agent Durastanti's interlocutory appeal taken from the denial of qualified immunity, but only to the extent the district court's order rested on issues of law.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1945-46 (2009); see also Swanson v. Town of Mountain View, 577 F.3d 1196, 1199 (10th Cir. 2009).  "When the question" on appeal "is whether there is sufficient evidence or whether the district court's findings with respect to a genuine issue of material fact are correct, an interlocutory appeal is improper."[5]  Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1249 (10th Cir. 2008); see also Swanson, 577 F.3d at 1199.  But a district court's decision concerning the existence of a factual dispute is not dispositive of jurisdiction if a defendant can persuade us that, viewing those facts in the light most favorable to the plaintiff, qualified immunity is warranted.  Eidson v. Owens, 515 F.3d 1139, 1145 (10th Cir. 2008).

## III.    DISCUSSION

"We review de novo the district court's summary judgment decision." Cordova v. Aragon, Berry & Murphy, P.C. v. Carolina Cas. Ins. Co., 586 F.3d 803, 808 (10th Cir. 2009).  However, "because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified

---

[5]  The Tenth Circuit has applied these jurisdictional principles, not only in § 1983 litigation against state actors, but also to Bivens actions brought against federal officials.  See Weise v. Casper, 507 F.3d 1260, 1262-64 (10th Cir. 2007).

immunity questions differently from other summary judgment decisions." Fisher

v. City of Las Cruces, 584 F.3d 888, 893 (10th Cir. 2009) (quotation, alteration

omitted). When a defendant moving for summary judgment asserts qualified

immunity, the court must conduct a two-part analysis:

> First, a court must decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.

Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009) (citation omitted). This court

has discretion to address these inquiries in any order. See id. at 818. And it is

the plaintiff, Mr. Thomas, who bears the burden of making this two-part showing.

See Hobbs ex rel. Hobbs v. Zenderman, 579 F.3d 1171, 1183 (10th Cir. 2009); see

also Fisher, 584 F.3d at 893.

### A. Whether Mr. Thomas has sufficiently established a claim that Agent Durastanti violated the Fourth Amendment by using excessive force

In his complaint, Mr. Thomas does not allege that Agent Durastanti could

not have seized him. Instead, Thomas alleges that, in seizing him, Agent

Durastanti "use[d] . . . excessive force," contrary to the Fourth Amendment,[6]

---

[6] In addition to this Fourth Amendment excessive force cause of action, Mr. Thomas argues on appeal that the Fifth Amendment substantive due process clause also provides an alternative basis for his damages claim. But the district court held that, because he had not included a Fifth Amendment cause of action in his complaint, Mr. Thomas could not raise such a claim for the first time in

(continued...)

10

Aplt. App. 14.  See Graham v. Connor, 490 U.S. 386, 394 (1989) (holding that, where "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protection of the Fourth Amendment").  "The Fourth Amendment protects individuals from 'unreasonable . . . seizures,' U.S. Const. amend. IV, and courts have long recognized that the reasonableness of a seizure depends not just on why or when it is made, but also on how it is accomplished."  Fisher, 584 F.3d at 894 (citing Graham, 490 U.S. at 395).

To state an excessive force claim "under the Fourth Amendment, plaintiffs must show *both* that a 'seizure' occurred and that the seizure was 'unreasonable.'"  Childress v. City of Arapaho, 210 F.3d 1154, 1156 (10th Cir. 2000) (citing Brower v. County of Inyo, 489 U.S. 593, 599 (1989)).  There are three possible seizures at issue in this case.  See generally Ludwig v. Anderson, 54 F.3d 465, 471 (8th Cir. 1995) (citing California v. Hodari D., 499 U.S. 621, 625 (1991), for the proposition that "many different seizures may occur during a single series of events").

First, Mr. Thomas may have been seized when the state trooper tried to pull over the Lincoln in the convenience store parking lot, and the ATF officers

---

[6](...continued)
response to Durastanti's summary-judgment motion.  Mr. Thomas has not appealed that decision and we, therefore, do not address Mr. Thomas's Fifth Amendment argument here.

11

approached the car at that time with guns drawn. While Mr. Thomas argued before the district court that this constituted a seizure, the district court did not address that argument in ruling on Agent Durastanti's motion for qualified immunity. Mr. Thomas, similarly, does not address that possible seizure now on appeal and, therefore, we need not address it either.

Second, Mr. Thomas was clearly seized after the shooting, when officers arrested him, and the other occupants of the car, several blocks away from the convenience store. Mr. Thomas does not challenge the force used to effect that seizure.

Finally, Mr. Thomas may have been seized when Agent Durastanti shot him as the Lincoln drove out of the convenience store parking lot. This alleged seizure is at issue in this interlocutory appeal.

The parties devote considerable time and effort litigating whether the Agent Durastanti's shot – a shot that hit Mr. Thomas but failed, at least initially, to stop the Lincoln's progress – constitutes a "seizure" for purposes of the Fourth Amendment. Compare Brower, 489 U.S. at 596, 599 (noting that a seizure requires "intentional acquisition of physical control" and occurs when "a person [is] stopped by the very instrumentality set in motion or put in place in order to achieve the result"), with Hodari D., 499 U.S. at 626 (dicta noting the "application of physical force to restrain movement, even when it is ultimately unsuccessful" is a seizure).

12

Even assuming without deciding Mr. Thomas can meet the seizure element of his claim, however, he cannot show that it was unreasonable. In analyzing the reasonableness of an alleged seizure, the key inquiry is "whether it would be clear to a reasonable officer [in the defendant's position] that his conduct was unlawful in the situation he confronted." Simkins v. Bruce, 406 F.3d 1239, 1241 (10th Cir. 2005) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). The use of deadly force is not unlawful if a reasonable officer would have had probable cause to believe that there was a threat of serious physical harm to himself or others. Graham, 490 U.S. at 396-97; Jiron v. City of Lakewood, 392 F.3d 410, 414-15 (10th Cir. 2004). Thus, if threatened by weapon (which may include a vehicle attempting to run over an officer), an officer may use deadly force. Scott v. Edinburg, 346 F.3d 752, 757 (7th Cir. 2003). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. We must consider whether Agent Durastanti could have reasonably perceived he was in danger at the precise moment that he used force and whether his own reckless or deliberate conduct (as opposed to mere negligence) unreasonably created the need to use force. See Sevier v. City of Lawrence, 60 F.3d 695, 699 & n.7 (10th Cir. 1995).

The district court determined, based on disputed facts about the speed of the Lincoln and the position of Agent Durastanti when he fired his third and

fourth rounds at the Lincoln, that a genuine dispute of material fact exists as to whether a reasonable officer would have used deadly force. Aplt. App. 782-83. The district court also concluded that Agents Thompson's and Durastanti's actions—pointing their weapons at the car and failing to announce themselves as police officers—may be deemed (by a jury) reckless acts that created the need to use force. Id. at 782.

Agent Durastanti argues that his use of deadly force was justified because he reasonably perceived that the Lincoln posed an immediate threat of death. Aplt. Br. 26-27. When evaluating the reasonableness of force employed in seizure, we consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Agent Durastanti testified that the Lincoln was accelerating towards him and he had no way to escape. Aplt Br. 27; Aplt. App. 114-115. In light of this situation, he contends, he reasonably chose to exercise deadly force. Aplt. Br. 27. Agent Durastanti argues that the speed of the Lincoln is not a contested fact because it can be observed on the marked patrol car's videotape, id. at 28, and that, in any event, the Lincoln's speed is only one of several factors contributing to the reasonable perception of danger (the others being the Lincoln's path toward him, its close range, its acceleration, and the short period of time he had to react). Id. at 28-29.

14

After Scott, we agree that the speed of the Lincoln is not a genuine dispute of material fact, even recognizing that the video does not capture the entire episode. The video does capture the Lincoln just after it began to move from the convenience store parking lot, and only about two or three seconds expire between that moment and the moment when Agent Durastanti rolled over the hood of the Lincoln. The Lincoln is obscured from view behind the agents' SUV for less than a second. Although Mr. Thomas maintains certain witnesses claim that the Lincoln slowed and perhaps even stopped, Aplee. Br. 43, that contradicts the video evidence. The video sufficiently captures the path of the Lincoln and its speed as well as its close proximity to the agents. There seems to be no room for genuine disagreement as to the speed of the Lincoln—it was moving deliberately out of the parking lot.[7] Scott, 550 U.S. at 379-81.

To be sure, Mr. Thomas argues that the videotape fails to show other critical events, such as (1) Agent Durastanti stepping into the Lincoln's path, (2) Agent Durastanti's first shots, and (3) whether Agent Durastanti could have stepped out of the way. Aplee. Br. 42. The first of these events is immaterial, given that Agent Durastanti undoubtedly was in the Lincoln's path in a very confined area (after all, the video captures him emerging from behind the Expedition and then on the hood of the Lincoln). As to the second of these

_____

[7] In particular, Mr. Thomas' argument that the Lincoln "inched" away and "carefully navigated" past the SUV, see Aplee. Br. 38, is belied by the video.

15

events, while Agent Durastanti's position when he fired the first shots is not visible, the sound of the shots can be heard and less than a second expires between the moment the shots were fired and the moment Agent Durastanti appeared in the video on the hood of the Lincoln. Though logic would seem to dictate that Agent Durastanti was in front of the Lincoln when he fired the shots (and could not have been to the side of the Lincoln as Mr. Thomas suggests, Aplee. Br. 33), he certainly was in close proximity. See Waterman v. Batton, 393 F.3d 471, 479 (4th Cir. 2005) (closeness of officers to projected path of vehicle justified use of deadly force). And the third event is immaterial, given that officers do not always have to use the least restrictive means as long as their conduct is reasonable. Cortez v. McCauley, 478 F.3d 1108, 1146 (10th Cir. 2007); Jiron, 392 F.3d at 414. Accordingly, the video does appear to resolve certain material disputes identified by the district court.

But even if we accept Mr. Thomas' argument that the videotape does not conclusively establish the speed of the Lincoln, we would still conclude that Agent Durastanti's actions were objectively reasonable. See Scott, 550 U.S at 380 ("'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'"). As we discuss below, Agent Durastanti saw the trooper's marked patrol car behind the Lincoln, its emergency lights, and Mr. Jones' apparent compliance with the

16

trooper's directive that Mr. Jones get back into the Lincoln. A reasonable officer could certainly conclude that the Lincoln's occupants had notice of police presence. Yet, the driver was pulling away from a traffic stop. In the process, the driver was advancing toward Agent Durastanti placing him in harm's way. No one argues that the driver was about to yield to pedestrians. Even given a dispute about whether the Lincoln was accelerating, it goes without saying that an officer in close quarters is no match for a two-ton vehicle. See Robinson v. Arrugueta, 415 F.3d 1252, 1255-56 (11th Cir. 2005). The Lincoln's driver (Almario Smith) would later plead guilty to assaulting the agents, admitting that he was driving directly toward both of them.[8] Aplt. App. 743, 752-53. Although Agent Durastanti's reasonable perceptions are what matters, he had mere seconds to react, and his actions in firing the first couple of shots were reasonable, even if mistaken. An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances. See Pearson, 129 S. Ct. at 815; Saucier, 533 U.S. at 206-07.

---

[8] Mr. Thomas argues that we cannot consider the plea documents because they are hearsay. "To be considered on a motion for summary judgment, the plea agreement must accordingly fall within one of the exceptions to the hearsay rule." In re Slatkin, 525 F.3d 805, 811 (9th Cir. 2008). As in Slatkin, to the extent that Smith's plea agreement is offered to prove his intent and is thus hearsay, it is admissible under Fed. R. Evid. 807. See id. at 812. Although Mr. Thomas argues that plea agreements are notoriously unreliable, Aplt. Br. 45-46, this argument is not developed with facts, so we decline to consider it. Insofar as he is arguing that an affidavit is required pursuant to Fed. R. Civ. P. 56(e)(1), Rule 56 plainly contemplates materials beyond affidavits—Rule 56(c)(2) contemplates review of "the discovery and disclosure materials on file, and any affidavits."

17

The sequence of events leading up to the time when the Lincoln struck Agent Durastanti is key in analyzing the reasonableness of Agent Durastanti's actions because Mr. Thomas' affidavit states that he was wounded in the first volley of shots. Aplt. App. 292. If this is indeed when Mr. Thomas was wounded, it was certainly reasonable for Agent Durastanti to believe that he was in danger at the "precise" time he fired the first two shots and seized Mr. Thomas. See Sevier, 60 F.3d at 699.

On appeal, Mr. Thomas also suggests that he was wounded in the second volley that Agent Durastanti fired. See Aplee. Br. 10-11, 40, 44. Even if Mr. Thomas was wounded after Agent Durastanti rolled off the Lincoln, however, Agent Durastanti's use of deadly force two seconds after the first shots was still justified. Although the district court concluded that Agent Durastanti's position when he fired the second two shots was a disputed material fact, Aplt. App. 783, this fact cannot be disputed because Agent Durastanti's position at that time is clearly shown on the video. See Scott, 550 U.S. at 379-81. What is contested, however, is the legal question of whether, given Agent Durastanti's physical position, he was justified in firing after the departing Lincoln. Agent Durastanti argues that, because he had been struck and propelled over the hood of the Lincoln, he was disoriented and fired the shots while believing that the Lincoln was still approaching him (even though it clearly was headed away from him). See Aplt. Br. 31-32. We recognize that circumstances may change within seconds

18

eliminating the justification for deadly force. See Waterman, 393 F.3d at 481-82. But Agent Durastanti's misperception appears to be quite reasonable, given that the video indicates that he had just been struck by the Lincoln and spun around, notwithstanding that he landed on his feet. Given such a disorienting experience, he had no assurance that the threat posed by the Lincoln had passed; this was a split-second decision concerning the use of deadly force under hardly ideal circumstances. Even if Agent Durastanti was mistaken, it was a reasonable mistake.

Agent Durastanti also argues that he was justified in firing the second round because a reasonable officer in his position could readily conclude that the Lincoln's occupants were at that point dangerous fleeing felons. Deadly force may be used to prevent the escape of a fleeing felon if the officer has probable cause to believe that the felon poses a significant threat of death or serious physical injury to the officers or others. Tennessee v. Garner, 471 U.S. 1, 11 (1985). Mr. Thomas' argument that the occupants of the Lincoln were "harmless" individuals who had merely been stopped for a routine traffic violation, see Aplee. Br. 47, ignores the driver's assault on the federal agents. See Garner, 471 U.S. at 11-12. After narrowly missing Agent Thompson and hitting Agent Durastanti, the officers had no assurance that the Lincoln would be carefully driven as it proceeded on its way with a with a state trooper in pursuit. The video establishes just the opposite. We need not resolve this issue, however, because

19

officer protection is sufficient justification for what occurred here.

Even if Agent Durastanti reasonably believed that it was necessary to use deadly force, we must still determine whether he recklessly or deliberately brought about the need to use such force. See Jiron, 392 F.3d at 415. Agent Durastanti's conduct prior to his being assaulted by the occupants of the Lincoln is relevant because it is a particular application of the "totality of the circumstances" inquiry under the Fourth Amendment's reasonableness standard. Medina v. Cram, 252 F.3d 1124, 1132 (10th Cir. 2001). In conducting its inquiry into the officers' conduct, the district court concluded that "agents Thompson and Durastanti's actions in pointing their weapons and failing to demonstrate their status as officers, could be found to be a reckless act." Aplt. App. 782.

Mr. Thomas argues the agents were supposed to remain observers of the traffic stop and that at the moment Agent Durastanti exited his vehicle with his weapon drawn, he had no reason to suspect that the occupants of the Lincoln had done anything other than commit a traffic violation. Aplee. Br. 51. According to Mr. Thomas, Agent Durastanti's reckless conduct drawing his weapon brought about the assault and the need to use deadly force. Aplee. Br. 51-52. Mr. Thomas also stresses that the occupants of the vehicle had not heard Agents Thompson and Durastanti identify themselves as police—in fact, Mr. Thomas argues that they never in fact identified themselves as police. Aplee. Br. 52. Agent Durastanti, on the other hand, testified that he became involved when it

20

appeared that the trooper did not have full control over the stop. Aplt. App. 467-68. He argues that the district court wrongfully viewed the events from the perspective of the Lincoln's occupants and did not take into account other circumstances, such as the prior indication of criminal activity on the part of the Lincoln's occupants (including the agent's observation of the Lincoln driving at 45-70 m.p.h. in a 30 m.p.h. residential zone and the fact that the Lincoln's registration was reported as not-on-file) and the presence of the marked patrol unit. Aplt. Br. 42, 44-50; Aplt. App. 97, 495.

The parties agree that Agent Durastanti did not identify himself as a police officer. Aplee. Br. 52. The district court characterized the dispute over whether Agent Thompson identified himself by saying that Mr. Thomas introduced "evidence that no individuals in the Lincoln heard Thompson state that he was a police officer." Aplt. App. 780. Accepting the district court's characterization of the dispute as a dispute over whether the occupants of the Lincoln *heard* Thompson identify himself—as opposed to whether he actually *did* identify himself—is immaterial. We must view the events from the perspective of the officer, not the occupants of the Lincoln. Graham, 490 U.S. at 396. Even given a factual dispute about whether Agent Thompson actually identified himself, Agent Durastanti's failure to identify them both as agents could still be viewed as reasonable given the trooper's marked patrol car behind the Lincoln, its emergency lights, and Mr. Jones' apparent compliance with the trooper's directive

21

that Mr. Jones get back into the Lincoln.[9]  Under these circumstances, it cannot be considered reckless for a plainclothes officer to not identify himself as police. See Medina, 252 F.3d at 1132 (stating that mere negligence is not sufficient to create a Fourth Amendment violation).

That leaves whether Agent Durastanti's decision to draw his weapon was reckless.  Although the district court referred to the agents' "pointing their weapons," Aplt. App. 782, the parties offer different accounts of when the agents drew their weapons and whether they were aimed initially at the Lincoln or its driver, or not at all.  Compare Aplt. Br. 46-47 with Aplee. Br. 15, 48, 51, 54. Given this uncertainty, we must view the facts presented in the light most favorable to Plaintiff, Walker v. City of Orem, 451 F.3d 1139, 1155 (10th Cir. 2006), and assume that the agents drew their weapons prior to the Lincoln beginning to move.

As an initial matter, it is clear that "[a] law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself

_____

[9]  The fact that Agent Durastanti observed the occupants in the Lincoln submit to the lawful authority of the uniformed state trooper who had his emergency lights flashing readily distinguishes this case from Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 557 (1st Cir. 1989).  Gutierrez-Rodriguez upheld a sizeable jury verdict for a due process violation where plainclothes officers fired upon a vehicle that drove away.  The officers knew nothing about the vehicle.  It was late at night, and the officers were driving an unmarked car. In contrast, Agent Durastanti was aware of the Lincoln's prior activity, it was daylight, and he certainly saw what reasonably appeared to be notice of police presence.

22

. . . regardless of whether probable cause to arrest exists." United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993) (quoting United States v. Alexander, 907 F.2d 269, 272 (2d Cir. 1990)) (internal quotation marks omitted). "There are no hard-and-fast rules regarding the reasonableness of force used during investigatory stops, and prior cases have eschewed establishing any bright-line standards for permissible conduct." Id. Here, the question is whether the agents' having observed the Lincoln driving erratically and at high speed and away from a high crime area—combined with the vehicle's tag having been reported as not-on-file and the vehicle's brief (and, according to the agents, suspicious) stop at a residence, see Aplt. Br. 42—would be sufficient for a law enforcement officer to reasonably conclude that the use of a gun in connection with the stop was necessary for protection. See United States v. Merritt, 695 F.2d 1263, 1273 (10th Cir. 1982). Merely because the suspects would later turn out to be unarmed is not "outcome determinative." Blossom v. Yarbrough, 429 F.3d 963, 968 (10th Cir. 2005).

By way of background, Mr. Thomas repeatedly maintains that the occupants of the Lincoln submitted to the state trooper's lawful authority prior to the Lincoln pulling out. Aplee. Br. 16, 36, 51. Accordingly, up until that point, the agents' drawing their weapons did not provoke the Lincoln's occupants. Thereafter, and given the wide latitude given officers to assess threats, an objectively reasonable officer could draw his weapon under these circumstances.

23

See United States v. Holt, 264 F.3d 1215, 1223 (10th Cir. 2001). The agents had observed the occupants driving an apparently stolen vehicle in a reckless manner and away from a high crime area, as though they were fleeing a crime; something more than a traffic violation was suspected. Additionally, Agent Durastanti saw the occupants leaving after being stopped by a uniformed state trooper in a marked patrol car with emergency lights, and after the occupants' apparent initial compliance with the trooper's commands. A reasonable officer based upon the totality of the circumstances certainly could believe that officer safety required the display of and access to weapons.

For these reasons, the district court erred in finding a constitutional violation based upon excessive force.

**B.**     **Whether, assuming a violation of the constitutional right against unreasonable seizure, the right was clearly established**

Even assuming that Agent Durastanti did violate Mr. Thomas' constitutional right against an unreasonable seizure, we must determine whether that right was "clearly established." See Perez v. Ellington, 421 F.3d 1128, 1131 (10th Cir. 2005) ("If our de novo review of Plaintiffs' version of the facts reveals that they do not amount to a violation of a clearly established right, we can reverse on an interlocutory basis."). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

24

Saucier, 533 U.S. at 202. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992); see Smith v. Cochran, 339 F.3d 1205, 1215 (10th Cir. 2003). While there does not have to be a case that is factually identical, it must still be apparent to a reasonable officer in light of pre-existing law that his conduct was unlawful. Price-Cornelison v. Brooks, 524 F.3d 1103, 1118 (10th Cir. 2008); see Walker, 451 F.3d at 1151. The plaintiff bears the burden of citing to us what he thinks constitutes clearly established law. Albright v. Rodriguez, 51 F.3d 1531, 1534-35 (10th Cir. 1995).

On appeal, Mr. Thomas relies upon the two cases that the district court identified as providing the clearly established law that Agent Durastanti violated. First, the court cited Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1192 (10th Cir. 2001), as establishing that "'the pointing of firearms . . . should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time.'" Aplt. App. 783. Second, the court cited Ryder v. City of Topeka, 814 F.2d 1412, 1417 (10th Cir. 1987), to support the proposition that "officers cannot use deadly force to prevent the escape of a suspect." Aplt. App. 783. Neither case clearly establishes the law with regard to the specific context of the case presented here. See Brosseau v.

25

Haugen, 543 U.S. 194, 198 (2004) (quoting Saucier, 533 U.S. at 201, for the proposition that the inquiry into whether the law is clearly established "'must be undertaken in light of the specific context of the case, not as a broad general proposition'").

Holland is not factually analogous. In Holland, the police pointed firearms at children and held the children at gunpoint after the officers had gained complete control of the situation. 268 F.3d at 1193. Here, in contrast, there was a rapidly developing situation and the officers clearly did not have complete control of the events that were unfolding. While Holland clearly states that the display of weapons should be predicated on a perceived risk of danger based on what an officer knows at the time, none of the risks or concerns identified by Agent Durastanti had been obviated when his weapon was displayed. Holland simply does not clearly establish that an officer may not draw his weapon when there is a rapidly developing situation with a traffic stop and the officers' concerns have not been obviated.

Ryder likewise does not clearly establish that Agent Durastanti could not use deadly force in attempting to stop the Lincoln. Ryder repeats the Supreme Court's rule that a police officer may not seize a fleeing, non-dangerous suspect by shooting him. 814 F.2d at 1417. However, Ryder also states that police may use deadly force to apprehend a fleeing suspect where the officers have probable cause to believe the suspect poses a threat of serious physical harm. Id. at 1418.

26

As discussed above, that is the situation presented in this case; the Lincoln posed an immediate threat of significant bodily injury or death to the agents and therefore Agent Durastanti was justified in using deadly force. Far from showing that Agent Durastanti violated clearly established law, Ryder suggests that Agent Durastanti's actions comported with clearly established law.

A more analogous case is Robinson, where an INS agent identified himself as police, told the driver to put his hands up, and pointed his firearm at the driver. 415 F.3d at 1254. The driver began to move forward at a speed of one to two miles per hour—rather than get crushed, the officer shot the driver. Id. The Eleventh Circuit had no difficulty concluding that the officer could use deadly force to stop a slow moving vehicle about to injure him. Id. at 1256. In addition to finding no constitutional violation, the court also held that no clearly established law suggested otherwise. Id. at 1256-57. Finally, the court declined to entertain other factual disputes concerning the circumstances under which the officer fired his gun. Id. at 1257. Mr. Thomas argues that Robinson is distinguishable because here the Lincoln was moving slowly towards Agent Durastanti and posed no real threat—a contention that we have rejected above as inconsistent with the latitude given officers and qualified immunity.

The dissent contends that we have ignored the most relevant disputed facts, specifically how Agent Durastanti ended up in front of the Lincoln and where he was when the first shots were fired, in addition to placing too great a focus on a

27

relevant disputed fact, the speed of the Lincoln. Yet the dissent also urges that "in disregarding the factual dispute regarding the Lincoln's speed," Dissent at 3, we have misapplied Scott, 550 U.S. at 372, as the entire sequence of events was not recorded and Mr. Thomas's version of the events is not blatantly contradicted by the record. Finally, the dissent contends that the law was clearly established in January 2006 based upon general principles concerning the use of deadly force. "[I]t was unreasonable to step deliberately in front of the Lincoln and use deadly force to try to stop its flight from a traffic stop." Dissent at 7 n.3.

We must disagree with the dissent's analysis. As we have explained, the events must be evaluated from the perspective of a reasonable, even if mistaken, officer. Agent Durastanti observed what appeared to be a stolen vehicle being driven in a reckless manner as though in flight, something more than a mere traffic violation. The Lincoln then submitted to a uniformed state trooper's show of lawful authority until it began pulling out of the parking lot. Agent Durastanti observed this. Once the Lincoln pulled away, Officer Durastanti was certainly entitled to assist in regaining control of the situation even if it brought him into close proximity of the Lincoln. See Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1075 (10th Cir. 2010) (the Fourth Amendment does not require officers to use the least restrictive means in investigating a threat). The video makes it clear that the Lincoln did not stop, but rather continued while Agent Durastanti's efforts to assist placed him in in a dangerous situation,

28

notwithstanding that the Lincoln may have been moving slowly and deliberately. Given the close proximity of the agents, we have no doubt that the Lincoln was being driven "in such fashion as to endanger human life"—that of the agents. Scott, 550 U.S. at 380. Moreover, we have explained that even if the video does not conclusively establish the speed of the Lincoln, qualified immunity is warranted.

Given Mr. Thomas's version of the events and what the record establishes, we have addressed the legal question of whether the force was excessive. See Scott, 550 U.S. at 381 n.8. We cannot say that the use of deadly force in these circumstances was objectively unreasonable; courts have little difficulty in concluding that an officer's reasonable perception that a vehicle may be used as a weapon may allow for the use of deadly force. See McCullough v. Antolini, 559 F.3d 1201, 1207 (11th Cir. 2009) ("We have . . . consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force."). The fact that flight from a traffic stop may have precipitated these events does not make the vehicle any less dangerous. Of course, each case turns on its own facts and circumstances. See Zia Trust Co. ex rel. Causey v. Montoya, 597 F.3d 1150, 1154-55 (10th Cir. 2010) (upholding the denial of qualified immunity in deadly force case where van was stuck on a retaining wall and officer was fifteen feet

29

away). In these close confines, Agent Durastanti's actions (even if mistaken) were within the range of reasonableness allowed law enforcement agents under the excessive force and qualified immunity doctrines. <u>See</u> <u>Brousseau v. Haugen</u>, 543 U.S. 194, 201 (2004).

REVERSED.

Thomas v. Durastanti, No. 07-3343
**EBEL**, Circuit Judge, dissenting.

I agree with the majority opinion's Sections I and II, as well as the opinion's general discussion of the law pertaining to Fourth Amendment excessive force claims. Further, I would conclude, as the majority assumes, that under the circumstances of this case Plaintiff Rickey Lee Thomas was seized when Defendant John Durastanti shot him. But I cannot agree with the remainder of the majority opinion and would, instead, affirm the district court's decision to deny Durastanti qualified immunity because there are genuinely disputed material facts that a jury, and not this court, must resolve.

Thomas alleged that Durastanti seized him using excessive force. "The reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Jiron v. City of Lakewood, 392 F.3d 410, 415 (10th Cir. 2004) (quotation omitted). In light of that, Thomas' claim was two-fold: 1) Durastanti used excessive force when, although in no immediate danger, he deliberately stepped in front of the Lincoln and began firing into it in an effort to stop the Lincoln's flight. And 2) even if the use of deadly force was reasonable at the moment Durastanti first fired into the Lincoln, his own reckless or deliberate conduct in approaching the Lincoln with his gun drawn, while wearing plain clothes, having just gotten out of an unmarked Ford Explorer, and

never identifying himself as a law enforcement officer, precipitated the later need to use deadly force by creating circumstances in which the Lincoln's driver, Almario Smith, reasonably believed he was about to be robbed or assaulted. We need address only Thomas' first theory in order to affirm the denial of qualified immunity.

In defense of Thomas' allegation that Durastanti, not being in any immediate danger, deliberately stepped into the Lincoln's path and began shooting in order to stop the Lincoln's flight, Durastanti asserts, to the contrary, that he was rushing around the back of his Explorer to check on his partner and in doing so found himself confronted by the Lincoln accelerating towards him as it headed out of the parking lot. Being only a car's length away from the Lincoln and unable to get out of its way, Durastanti feared for his life and therefore shot at the Lincoln in self defense.

Confronted with these divergent stories, the district court held that factual disputes material to this claim precluded entering summary judgment for Durastanti based upon qualified immunity, specifically determining that "[t]he actions of all the individuals involved in this incident are in dispute." (Aplt. App. at 780.) We do not have jurisdiction, in this interlocutory appeal, to consider the propriety of the district court's determination that there remain disputed issues of material fact. See Couture v. Bd. of Educ. of Albuquerque Pub. Sch., 535 F.3d 1243, 1249 (10th Cir. 2008). Nonetheless, the majority concludes we can ignore

2

these factual disputes because they are either not genuine or not material to Thomas' claim. I am not persuaded.

The majority is able to avoid these factual disputes only by focusing on less relevant aspects of the incident and avoiding entirely the most relevant disputed facts. In addressing Thomas' first theory of recovery, the majority focuses almost exclusively on the speed at which the Lincoln was traveling out of the parking lot. While that is relevant to Thomas' claim, it is certainly not the most crucial disputed fact.

Moreover, in disregarding the factual dispute regarding the Lincoln's speed, the majority misapplies Scott v. Harris, 550 U.S. 372 (2007). In determining that there was a factual dispute as to how fast the Lincoln was moving, the district court noted that Thomas had evidence indicating that the Lincoln was moving very slowly when it hit Durastanti. Relying on Scott, the majority opinion concludes that there is no genuine factual dispute about the speed the Lincoln was traveling because, contrary to the district court's determination, the video of the incident taken from the state trooper's patrol car conclusively established that the Lincoln "was moving deliberately out of the parking lot."[10] (Op. at 15.)

---

[10]It is not obvious that the fact that the Lincoln was travelling "deliberately" out of the parking lot is contrary to the district court's determination that Thomas had evidence that the Lincoln was moving very

(continued...)

3

Scott provides an exception to the usual rule that a court, in considering a motion for summary judgment based upon qualified immunity, must accept the facts as the plaintiff has alleged and supported them. See 550 U.S. at 379-81. Scott instead permits a court to reject the plaintiff's version of events when the record "blatantly contradict[s]" that version. See id. at 380.

In this case, however, the video does not "blatantly contradict" Thomas' version of events. The video shows only a very small portion of the thirty-seven-second incident occurring in the gas station parking lot.[11] The video

_____

[10](...continued)
slowly. One acts deliberately by acting in a deliberate manner, "characterized by or resulting from slow careful consideration of effects and consequences," and in a "slow, unhurried and steady manner." Webster's Third Int'l Dictionary, 596 (1986). A person could surely drive both deliberately and very slowly.

[11]In this respect, this case is very different from Scott. In Scott, Victor Harris sued Deputy Scott alleging the officer used excessive force to stop Harris after Harris refused to stop when the officer tried to pull him over for speeding. See 550 U.S. at 374-76. For six minutes Deputy Scott pursued Harris ten miles down a two-lane road, until Harris lost control of his vehicle after Scott bumped his car from behind. See id. at 374-75. Harris alleged that during this chase, he remained in control of his vehicle, slowed for turns and intersection, used his turn signal and did not otherwise present an actual threat to other motorists or pedestrians. See id. at 378-79. Ordinarily, a court considering a motion for qualified immunity would have to accept that version of the events. See id. at 378. But in Scott, a video camera in Deputy Scott's vehicle recorded the entire six-minute chase. See id. at 378-79. And that video showed "quite a different story," depicting Harris driving "shockingly fast," running red lights, swerving around more than a dozen cars, crossing the yellow line and forcing cars in both directions to drive onto the shoulder of the road to avoid Harris. Id. at 379. It was under these circumstances that the Supreme Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that
(continued...)

4

gives the viewer a brief glimpse of the Lincoln turning into the Valero station, ten seconds ahead of Trooper Spencer. But because the trooper was not able to pull into the station and park directly behind the Lincoln, the video does not record any of the events that occurred in that parking lot up until the state trooper begins to follow the Lincoln out into the street, thirty-five seconds later. And even then the video shows only the back of the Lincoln as it moves around the ATF agents' Explorer. Further, because the Explorer is parked between the trooper's car and the Lincoln, the video does not show Durastanti with any clarity until he rolls off the left front of the Lincoln a few seconds later. So, yes, at that moment a viewer can gauge the speed of the Lincoln. But the video does not show the speed of the Lincoln at the time Durastanti stepped in front of it, or at the time he first shot into it. More relevant to Thomas' claim, the video does not show how Durastanti got in front of the Lincoln or his position when he shot into the car. The district court determined that there were genuine factual disputes as to those critical circumstances. And the video does not provide a clear basis to disregard that determination. See York v. City of Las Cruces, 523 F.3d 1205, 1210-11 (10th

---

[11](...continued) version of the facts for purposes of ruling on a motion for summary judgment." Id. at 380. In Scott, then, because Harris' "version of events [wa]s so utterly discredited by the record that no reasonable jury could have believed him," the court did not have to accept his version of the events. Id. Instead, the court considering Deputy Scott's motion for summary judgment based upon qualified immunity "should have viewed the facts in the light depicted by the videotape." Id. at 380-81.

Cir. 2008) (declining to disregard plaintiff's version of events based upon audiotape that captured only part of the relevant events).

The majority opinion further concludes that it is immaterial that the video does not show Durastanti stepping into the path of the Lincoln, because it is a "[g]iven that [he] undoubtedly was in the Lincoln's path." But how he got in the Lincoln's path is a fact critical to Thomas' theory of recovery. The majority further assures us that, although the video does not show where Durastanti was when he first shot into the car, we can use "logic" to surmise where he must have been. That fact, too, is crucial to Thomas' claim and it remains disputed. The majority's use of the video to disregard this factual dispute and instead infer what must have happened is an improper application of Scott, see York, 523 F.3d at 1210-11, particularly on interlocutory appeal from the district court's determination that disputed material factual disputes precluded summary judgment based upon qualified immunity.

The majority thus errs in relying on Scott to disregard a genuine factual dispute regarding the speed of the Lincoln when Durastanti shot into the car. Moreover, the majority does not even address the district court's determination that there were genuine disputes regarding the facts most material to Thomas' claim, how Durastanti got in front of the Lincoln and where he was when he first shot into that car. We do not have jurisdiction to review that determination. See Couture, 535 F.3d at 1249. And the district court did not err in determining that a

6

reasonable jury could find that Durastanti acted unreasonably in light of the facts as Thomas has alleged them and as a reasonable officer in Durastanti's position would have perceived them. I would, therefore, affirm the district court's decision to deny Durastanti qualified immunity.[12]

---

[12]I would also conclude, contrary to the majority, that the district court correctly determined that the law governing excessive force claims was clearly established. In addressing an excessive force claim,

> [a]n officer using force in the course of a seizure of a citizen is entitled to qualified immunity unless the level of force violated clearly established Fourth Amendment law. . . . This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.

Thomson v. Salt Lake County, 584 F.3d 1304, 1313 (10th Cir. 2009) (quotation, citations omitted). Said another way, "an officer's violation of the Graham [v. Connor, 490 U.S. 386 (1989)] reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was legitimate justification for acting as []he did." Buck v. City of Albuquerque, 549 F.3d 1269, 1291 (10th Cir. 2008) (quotations omitted).

It was clearly established by January 2006 that the use of "deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." Cordova v. Aragon, 569 F.3d 1183, 1192 (10th Cir. 2009) (citing, e.g., Graham, 490 U.S. at 396), cert. denied, 130 S. Ct. 1146 (2010). Again viewing the evidence in the light most favorable to Thomas, it was clearly established at that time that it was unreasonable to step deliberately in front of the Lincoln and use deadly force to try to stop its flight from a traffic stop. Therefore, because a reasonable jury could find that Durastanti's conduct was objectively unreasonable, the district court did not err in concluding that Thomas had established a claim that Durastanti violated Thomas' clearly established Fourth Amendment rights.

7