**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 12, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LUCIA FANCHER, individually and
as personal representative of the estate
of Nick Dominguez,

       Plaintiff - Appellee,

    v.

JOHNNY BARRIENTOS, in his
individual and official capacity;
SHERIFF TODD GARRISON,
COUNTY OF DOÑA ANA,

       Defendants - Appellants.

No. 12-2114

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 2:11-CV-00118-LH-LAM)**

Kevin M. Brown (Desiree D. Gurule and Elizabeth V. Friedenstein with him on
the briefs), Brown Law Firm, Albuquerque, New Mexico, for Defendants -
Appellants.

Mark Fine, Fine Law Firm, Albuquerque, New Mexico, for Plaintiff - Appellee.

Before **LUCERO**, **MURPHY**, and **MATHESON**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I.    Introduction

Defendant Johnny Barrientos, a deputy of the Doña Ana County Sheriff's Department, appeals the district court's denial of his motion for summary judgment in a 28 U.S.C. § 1983 action brought by Lucia Fancher, individually and on behalf of the estate of her son, Nick Dominguez. Fancher alleges Barrientos used excessive force in violation of the Fourth Amendment when he shot Dominguez seven times following a confrontation in Mesquite, New Mexico. Dominguez died as a result of one or more gunshot wounds. Barrientos asserts he is entitled to qualified immunity because his use of deadly force was objectively reasonable and did not violate clearly established law. The district court granted Barrientos's motion for summary judgment to the extent Fancher's claim arose from the firing of the initial shot, but denied the motion to the extent the claim arose from the firing of the subsequent six shots.

On appeal, Barrientos makes three arguments. First, he asserts the district court erred in analyzing the second through seventh shots separately from the first shot. Next, he argues the district court did not sufficiently consider the risks posed to third parties in analyzing the reasonableness of shots two through seven. Finally, he argues the law was not clearly established that his actions violated the Fourth Amendment. This court lacks jurisdiction to consider the first two arguments, and is unpersuaded by the third. Thus, exercising jurisdiction

pursuant to 28 U.S.C. § 1291, this court **affirms** the denial of summary judgment by the district court.[1]

## II.    Background

Because, when reviewing the denial of a summary judgment motion asserting qualified immunity, we lack jurisdiction to review the district court's conclusions as to what facts the plaintiffs may be able to prove at trial, *Fogarty v. Gallegos*, 523 F.3d 1147, 1154 (10th Cir. 2008); *see also supra* Part III.A., we restate the district court's account of the relevant factual background here:

> On March 29, 2010, at approximately 5:41 p.m., Deputy Barrientos responded to a reported theft of two 20-packs of bottled Budweiser beer from the Mesquite Mercantile in Mesquite, New Mexico.  There was no report that the suspects were armed or threatening.  Deputy Barrientos was on duty, in full uniform with his badge displayed, and driving a marked patrol vehicle.  Defendant Barrientos was issued two patrol rifles, but his squad car was equipped with only one lock for one of the rifles.  He had the assault rifle in the front seat of his car . . . .
>
> Upon arrival at the Mercantile, Deputy Barrientos interviewed a female clerk who told him that the manager in the back office had a security camera video of the theft.  Deputy Barrientos reviewed the video, which showed a male in a white shirt and blue jeans at the

---

[1]Fancher's complaint also includes claims against Sheriff Todd Garrison in his individual and official capacities as well as the County of Doña Ana. Although all defendants filed the notice of appeal, the only issues raised relate to the denial of qualified immunity to Barrientos.  Sheriff Garrison did not claim entitlement to qualified immunity and the county is not entitled to qualified immunity, *Starkey ex rel. A.B. v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1263 n.4 (10th Cir. 2009) ("Qualified immunity . . . is available only in suits against officials sued in their personal capacities, not in suits against governmental entities or officials sued in their official capacities.").

counter, and a second male wearing a black jacket and black pants moving quickly across the screen. The clerk told Deputy Barrientos that the individual at the counter was named Michael and might live in a trailer near Highway 192.

Deputy Barrientos began searching the property outside the Mercantile when police dispatch advised him at approximately 6:02 p.m. of a trespass involving two vehicles and several subjects drinking at the Helena Chemical plant, across the road from the Mercantile. While proceeding to the plant, Deputy Barrientos observed a male wearing a white shirt and blue jeans riding a bicycle down an alley. Deputy Barrientos stopped the bicyclist for questioning at approximately 6:06 p.m. Deputy Barrientos identified the bicyclist as an older man named Carlos Ceniceros, who informed him that he knew where the individuals who stole the beer were and that they were near a red car.

As Deputy Barrientos interviewed Mr. Ceniceros, a man from a nearby house approached them and stated that the suspects were in the area of an irrigation canal by a tree. Deputy Barrientos began searching for the suspects, driving his patrol vehicle northbound on the east side of a large irrigation canal accessible from Highway 192. He spotted a red car turn onto the west side of the canal driving northbound. Believing that the red car was associated with the theft at the Mercantile, Deputy Barrientos activated his emergency equipment and initiated a traffic stop at approximately 6:18 p.m. The red car yielded at a tree near the intersection of the large irrigation canal and a smaller canal.

Deputy Barrientos's practice and training are to leave the patrol vehicle running with the emergency equipment engaged during traffic stops. The window was down to facilitate his visual search of the area. The squad car was parked facing north on a clearing of hard dirt.

Deputy Barrientos approached and questioned the driver who remained in the car. Because the driver was a man in his late fifties and the sole occupant of the vehicle, Deputy Barrientos concluded that he was not involved in the theft and released him.

Immediately after the red car drove off, Deputy Barrientos observed Mr. Ceniceros seated on the ground across the large canal

to the northeast. Deputy Barrientos had not moved from where he had been standing beside the driver's door of the red car. He walked toward Mr. Ceniceros to question him further about the suspects. There was a water pipe spanning the large canal which allowed foot traffic to move from one side to the other. When asked about the suspects' location, Mr. Ceniceros said he did not know, but indicated behind Deputy Barrientos with his eyes and by nodding.

Just then, Deputy Barrientos heard a noise behind him and turned around to see that a beer bottle had landed near him. The bottle landed between 10 to 15 feet away from him. In his experience, a bottle can be used as a weapon. He was still unable to see the suspects.

Because the thrown beer bottle indicated someone was hiding and he did not know who it was or what was going on, Deputy Barrientos drew his weapon and walked toward a large irrigation pump in order to see behind it. Using a tactical maneuver that he was trained to use, Deputy Barrientos moved around the pump in an attempt to expose the suspects while maintaining a safe distance. Deputy Barrientos saw two young men and a young woman hiding in a depression on the far side of a steel I-beam that served as a foundation for the pump. Deputy Barrientos recognized one of the young men who wore a white shirt and blue jeans, later identified as Michael Herrera, from the Mercantile security video. Deputy Barrientos also recognized his own cousin, Valerie Gonzalez, and was concerned that she might try to harm him because she had gang affiliations and had previously made negative comments about the fact that Deputy Barrientos was a law enforcement officer. The second young man, wearing black pants without a shirt, was later identified as Nick Dominguez. Nick Dominguez was 17 years of age at the time.

Deputy Barrientos notified dispatch at 6:21 p.m. that he had three suspects at gun point. He then commanded the subjects to show their hands. Mr. Herrera complied while remaining on his knees. Ms. Gonzalez also complied. Mr. Dominguez, however, remained crouched on the ground concealing his hands, which concerned Deputy Barrientos because he feared that the suspects could have weapons concealed in their clothing. Mr. Dominguez's

-5-

failure to comply prevented Deputy Barrientos from frisking the suspects to this point.

Deputy Barrientos commanded Ms. Gonzalez to step over the I-beam and lie down, and she complied. Mr. Herrera remained on his knees and kept his hands raised. Deputy Barrientos ordered Mr. Dominguez to move closer to him and to step over the I-beam and lie down next to Ms. Gonzalez. After refusing to comply with several commands, Mr. Dominguez stepped over the I-beam but did not lie down as instructed. Instead, Mr. Dominguez moved toward Deputy Barrientos in three motions, asking "right here?" each time. Mr. Dominguez moved within a couple of feet of Deputy Barrientos. Deputy Barrientos again ordered Mr. Dominguez to lie down, but instead he dropped to one knee and then suddenly lunged at Deputy Barrientos, grabbing his duty weapon with both hands.

As the two men struggled, Mr. Dominguez yelled to the other suspects to run away. Deputy Barrientos again commanded Mr. Dominguez to release his weapon and get on the ground but he did not comply. During the struggle, Ms. Gonzalez remained prone on the ground with her head and shoulders toward Deputy Barrientos and Mr. Dominguez, while Mr. Herrera remained on his knees. Both suspects were just a few feet away from the struggle.

The men fell to their knees with Mr. Dominguez on Deputy Barrientos's left side. The weapon discharged into the ground and malfunctioned. The discharge concerned Deputy Barrientos because the bullet could have struck himself, Ms. Gonzalez, or Mr. Herrera, who were both just a few feet away; Mr. Ceniceros, who was a few yards away; or an occupant at one of the residences across the field. After the weapon discharged, Mr. Dominguez continued trying to take it away from Deputy Barrientos. Deputy Barrientos forced the weapon's barrel into the dirt and then drew his taser.

Deputy Barrientos tasered Mr. Dominguez in the back. Although the taser deployed, it did not work. Mr. Dominguez then let go of the gun, pushed free from the struggle, and fled directly toward the patrol vehicle, jumping over the smaller irrigation canal. Deputy Barrientos saw that the malfunction was a so-called "stove pipe" jam, where the spent shell casing lodges in the ejection port

and prevents the weapon from firing. He quickly cleared the malfunction and ran after Mr. Dominguez.

Mr. Dominguez entered the driver's side of the patrol vehicle just as Deputy Barrientos caught up to him. At that moment, Deputy Barrientos was aware that Mr. Dominguez had just tried to take his duty weapon away from him and that there were two loaded long guns in the vehicle. Deputy Barrientos believed that a round fired from one of the long guns, an AR-15 assault rifle, could have struck a nearby residence.

Deputy Barrientos quickly approached the patrol vehicle and, with his duty weapon in his right hand, tried to remove the ignition keys with his left hand while shouting at Mr. Dominguez to stop and get out of the vehicle. Mr. Dominguez pushed Deputy Barrientos's left hand away, resisting his attempt to remove the ignition keys. The engine was racing. As Deputy Barrientos struggled to remove the ignition keys, Mr. Dominguez shifted the patrol vehicle into reverse.

Deputy Barrientos fired his duty weapon at Mr. Dominguez's center mass, or chest area. He began firing his weapon before the vehicle started going backwards. Deputy Barrientos was sure that he had hit Mr. Dominguez with the initial shot to the chest because he saw him slump.

After firing his weapon, the car began to press up against his shoulder. He could feel the car pushing him away and turning him to the right. Deputy Barrientos testified that he took two or three steps away from the car after the first shot. He testified that he felt safer after he backed away from the vehicle. The squad car continued to move in reverse, away from Deputy Barrientos. He nevertheless continued shooting at Mr. Dominguez after he had moved backwards those two to three steps, even though he did not at that time have any indication that Mr. Dominguez was armed.

Deputy Barrientos fired seven shots. Mr. Herrera heard a period of silence between two separate rounds of gunfire. He heard a series of gunshots, followed by five to seven seconds in which he did not hear any gunshots, followed by the sound of two more gunshots.

Mr. Ceniceros saw Deputy Barrientos fire shots at Mr. Dominguez while he was in the car. Immediately after Deputy Barrientos fired the last shot, Mr. Ceniceros saw Deputy Barrientos at a distance of between eight to ten feet from the side of the squad car.

Deputy Barrientos testified that, if his long gun had not been in the car, he likely would not have shot Mr. Dominguez. Although he had mace on him at the time he first shot Mr. Dominguez and was within range to use it, Deputy Barrientos did not consider using it instead of deadly force. Deputy Barrientos was sure that firing his weapon effectively eliminated any threat posed by Mr. Dominguez. At 6:22 p.m., Deputy Barrientos notified dispatch that the subject was down.

. . . .

New Mexico State Police Agent Norman Rhoades was assigned to be the "crime scene manager" of the crime scene in this case. Based on Deputy Barrientos's initial statement describing events and evidence at the crime scene, Agent Rhoades prepared crime scene diagrams. The diagrams show that the squad car moved in a backwards arc from its initial position and came to a stop at the end of its backward arc in a field of weeds and fine sand. Based on his investigation, Agent Rhoades determined that, when Mr. Dominguez was behind the wheel of the squad car, the car only moved in reverse away from Deputy Barrientos.

Agent Rhoades indicated in the diagrams that a shot into the chest through the heart was "Possibly 2nd shot;" the shot into the upper left front seat backrest was "Possibly 3rd shot;" the shot into the upper left front door was "Possibly 4th shot;" and the shot into the lower left front door was "Possibly 5th shot." Agent Rhoades acknowledged, though, that the sequences 2 through 5 in the diagrams "could be altered as far as the sequence goes." He explained that, for example, wound C could have just as likely been caused by shot 2, 3, 4, or 5. The diagrams further state: "Possibly 6th shot, into upper left front door striking both arms," and "Possibly 7th shot, striking suspect's head." Agent Rhoades acknowledged that shots 6 and 7 could be re-sequenced.

Mem. Op. & Order at 1–10 (citations omitted).

Fancher brought suit under 28 U.S.C. § 1983, alleging Barrientos's use of deadly force against Dominguez was unreasonable and violated the Fourth Amendment. Barrientos moved for summary judgment, arguing he was entitled to qualified immunity because his use of deadly force was objectively reasonable as a matter of law. Relying heavily on *Thomas v. Durastanti*, 607 F.3d 655, 665 (10th Cir. 2010), the district court concluded Barrientos did not violate Dominguez's constitutional rights by firing the first shot because his reaction to a violent, fleeing felon was objectively reasonable. Alternatively, the court concluded it was not clearly established at the time of the shooting that Barrientos's firing of the first shot was unlawful. The district court also concluded, however, that multiple unresolved factual issues precluded summary judgment as to the firing of the remaining shots:

> Deputy Barrientos testified that he saw Mr. Dominguez slump after the first shot. He also testified that, after the first shot, he stepped away from the car, and thus, was not in immediate danger of being run over with the vehicle, which was moving backwards away from him. Significantly, Deputy Barrientos testified that he felt safer after having taken those steps away from the vehicle. Additionally, Deputy Barrientos's testimony indicated that Mr. Dominguez was not reaching for the long guns in the vehicle after the first shot.
>
> A jury could construe Mr. Dominguez's slumping as an indication that he was no longer able to control the vehicle, to escape, or to fire a long gun, and thus, may no longer have presented a danger to the public, Deputy Barrientos, or other responding officers. Moreover, a jury could also reasonably construe Deputy Barrientos's testimony that he did not fire the second shot until after

-9-

he stepped back, felt safer, and noticed Mr. Dominguez slump as indicating that enough time passed between the first and second shots for Deputy Barrientos to recognize and react to the changed circumstances and cease firing his gun. There is thus a question of fact as to whether, under the totality of circumstances, Deputy Barrientos reasonably perceived that he or others were in danger at the precise moments that he fired shots two through seven, and thus, whether those additional shots were excessive.

Mem. Op. & Order at 30. The court therefore denied qualified immunity to Barrientos as to shots two through seven. This appeal followed.

## III. Discussion

### A. Jurisdiction[2] and Standard of Review

This court has jurisdiction under 28 U.S.C. § 1291 to review "all final decisions of the district courts of the United States." Ordinarily, an order denying summary judgment is not a "final decision" within the meaning of § 1291. *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013). The denial of qualified immunity to a public official, however, is immediately appealable under the collateral order doctrine to the extent it involves abstract issues of law. *Johnson v. Jones*, 515 U.S. 304, 317 (1995); *Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1258 (10th Cir. 1998). Thus, "[a] determination that the law allegedly violated by the defendant was clearly established at the time of the challenged actions is an abstract issue of law that is

---

[2]This court has an independent obligation to ensure it has subject matter jurisdiction at every stage of the litigation. *Devon Energy Prod. Co. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1208 n.10 (10th Cir. 2012).

-10-

immediately appealable.  A determination that under either party's version of the facts the defendant violated clearly established law is also immediately appealable."  *Foote v. Spiegel*, 118 F.3d 1416, 1422 (10th Cir. 1997).

This court, however, lacks jurisdiction at this stage "to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference."  *Fogarty*, 523 F.3d at 1154.  Thus, in reviewing the district court's rejection of Barrientos's qualified immunity defense, "we must scrupulously avoid second-guessing the district court's determinations regarding whether [Fancher] has presented *evidence* sufficient to survive summary judgment."  *Clanton v. Cooper*, 129 F.3d 1147, 1153 (10th Cir. 1997).[3]

Within this court's limited jurisdiction, we review the district court's denial of a summary judgment motion asserting qualified immunity de novo.  *Dodds v.*

---

[3]*Johnson*'s jurisdictional rule is subject to a few exceptions.  If the district court does not "identify the particular charged conduct that it deemed adequately supported by the record, we may look behind the order denying summary judgment and review the entire record *de novo* to determine for ourselves as a matter of law which factual inferences a reasonable jury could and could not make."  *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010).  "Second, when the 'version of events' the district court holds a reasonable jury could credit 'is blatantly contradicted by the record,' we may assess the case based on our own *de novo* view of which facts a reasonable jury could accept as true."  *Id.* at 1225–26 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  Finally, this court "need not defer to the district court's assessment of the reasonable factual inferences that arise from a complaint at the motion to dismiss stage."  *Id.* at 1226.  The first and third of these exceptions are plainly inapplicable, and Barrientos has not advanced an argument in support of the second.

*Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

   B.    Barrientos's Assertion of Qualified Immunity

   1.    "Segmented" Analysis

Barrientos first argues the district court erred in analyzing shots two through seven separately from the first shot. Barrientos nominally frames this argument as a legal issue, asserting that segregating the shots as the district court did constitutes a "misapplication of the totality of the circumstances standard" which is applied when analyzing excessive force claims. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (holding that determining whether force was excessive under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"); *Tennessee v. Garner*, 471 U.S. 1, 3 (1985) (holding deadly force may not be used "to prevent the escape of an apparently unarmed suspected felon . . . unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical

-12-

injury to the officer or others"). Ultimately, however, Barrientos's argument depends upon a challenge to the facts the district court concluded a reasonable jury could infer based upon the evidence in the summary judgment record. For example, Barrientos asserts the district court's use of a segmented approach was error "when *the facts of the incident are* that Barrientos and the public were placed in danger from the moment he was attacked by the decedent until the time that Barrientos was completely sure that neither he nor the public were in further danger." Appellant's Br. at 19 (emphasis added).

The district court relied on *Thomas* for the proposition that "circumstances may change within seconds eliminating the justification for deadly force." 607 F.3d at 666; *accord Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("We therefore hold that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."). Barrientos does not take issue with the district court's reliance on *Thomas* or *Waterman* as an abstract legal matter, i.e., he does not argue it is never appropriate in an incident involving the firing of multiple shots by a police officer to analyze the shots separately if the circumstances so warrant. Instead, Barrientos strenuously argues that the circumstances of *this* case are not amenable to such analysis. Specifically, he argues that, unlike the situation in *Waterman*, "the threat of harm caused by the decedent to Barrientos and to nearby community members existed for the duration of the approximately ninety . . . second

-13-

incident." Appellant's Br. at 22. The district court, however, concluded the evidence was sufficient for a reasonable jury to draw a contrary inference:

> Although in some circumstances multiple shots fired in a matter of seconds should be grouped together in the qualified immunity analysis, this case is different. Here, there is evidence that Deputy Barrientos had time between the first shot and the following shots to take a few steps back to get out of the way of the car, to assess the situation, and to know that Mr. Dominguez had slumped and may not have presented a continuing danger to himself or to the public.

Mem. Op. & Order at 16. Because Barrientos's first argument on appeal cannot reasonably be understood as anything other than an attack on these conclusions of the district court, this court lacks jurisdiction to consider it. *Fogarty*, 523 F.3d at 1154; *Clanton*, 129 F.3d at 1153.

### 2. Danger to Third Parties

Barrientos's second argument on appeal is similarly unreviewable. Barrientos argues the district court did not consider the risk posed to third parties in applying the segmented approach. In support of this argument Barrientos lists several material facts which he alleges the district court failed to consider when analyzing whether Dominguez posed a continuing threat after the first shot. Barrientos goes on to argue that these facts should have led the district court to conclude that he "could not reasonably have known that [Dominguez] was sufficiently subdued such that he no longer presented a threat to the officer or the community when Deputy Barrientos fired shots two through seven." *Id.* at 25. Again, Barrientos's argument amounts to nothing more than a request for review

of the "factual conclusions" of the district court, a task which exceeds the scope of our jurisdiction on interlocutory review of the denial of qualified immunity. *Fogarty*, 523 F.3d at 1154.

3.      Clearly Established Law

Unlike Barrientos's first two arguments, his third presents no jurisdictional difficulties. Whether a constitutional right was clearly established at the time an alleged violation occurred is a "quintessential" example of a purely legal determination fit for interlocutory review. *Garrett v. Stratman*, 254 F.3d 946, 952 n.8 (10th Cir. 2001). Nonetheless, in light of the facts we must assume to be true at this stage of the proceedings, we readily conclude Barrientos's argument is without merit. In *Casey v. City of Federal Heights*, this court discussed the "clearly established" standard in the context of excessive force claims:

> Ordinarily . . . for a rule to be clearly established there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. However, because excessive force jurisprudence requires an all-things-considered inquiry with "careful attention to the facts and circumstances of each particular case," *Graham*, 490 U.S. at 396, there will almost never be a previously published opinion involving exactly the same circumstances. We cannot find qualified immunity wherever we have a new fact pattern. Indeed, the Supreme Court has warned that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional.

509 F.3d 1278, 1284 (10th Cir. 2007) (citations and quotations omitted). According to the factual scenario upon which the district court based its rejection of Barrientos's claim to qualified immunity, which this court lacks the authority to review, Barrientos fired six shots into a suspect who was "no longer able to control the vehicle, to escape, or to fire a long gun, and thus, may no longer have presented a danger to the public, Deputy Barrientos, or other responding officers." Mem. Op. & Order at 30. Prior to shooting Dominguez, Barrientos "stepped back, felt safer, and noticed Mr. Dominguez slump." *Id.* This allowed him "enough time . . . to recognize and react to the changed circumstances and cease firing his gun." *Id.* Under these circumstances, we have no trouble concluding Barrientos lacked probable cause to believe Dominguez posed a threat of serious harm to Barrientos or others at the time he fired shots two through seven. *Garner*, 471 U.S. at 3, 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). We further have no trouble concluding a reasonable officer in Barrientos's position would have known that firing shots two through seven was unlawful. *Casey*, 509 F.3d at 1284. Accordingly, the district court, in evaluating Barrientos's assertion of qualified immunity, did not err in concluding Barrientos violated clearly established law when he fired shots two through seven.

## IV.    Conclusion

For the foregoing reasons, the judgment of the district court is **affirmed**.