**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 8, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ANGELIC SALGADO, as personal
representative of the Wrongful Death
Estate of Jonathan Molina,

    Plaintiff - Appellant,

v.

KEVIN SMITH, in his individual capacity,

    Defendant - Appellee.

No. 24-2068
(D.C. No. 1:21-CV-00749-JCH-GBW)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **PHILLIPS**, and **EID**, Circuit Judges.
_____

Plaintiff-Appellant Angelic Salgado, personal representative of the wrongful

death estate of the deceased, Jonathan Molina, sued Defendant-Appellee New Mexico

State Police Officer Kevin Smith under 42 U.S.C. § 1983, asserting that Smith

violated Molina's Fourth Amendment right to be free from excessive force when

Smith fatally shot him.  The district court granted summary judgment for Smith based

on qualified immunity, finding no constitutional violation and no violation of clearly

established law.  Salgado appeals.  We affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

**I.**

**A.**

This case concerns the tragic death of Jonathan Molina in Albuquerque, New Mexico, on July 15, 2018.[1]  In the early morning hours (shortly before 2:00 A.M.) of July 15, 2018, Officer Kevin Smith was on random patrol along Interstate 25 within the city boundaries of Albuquerque.  While patrolling southbound, Smith saw a blue Honda sedan traveling at a high rate of speed.  Using his radar, Smith clocked the blue Honda traveling at around 101 miles per hour in a posted 65 mile-per-hour zone.

Smith then pursued the blue Honda and radioed to police dispatch his location and the blue Honda's license plate number.  The dispatcher responded to Smith and informed him that the license plate number belonged to a red—not a blue—Honda. Smith confirmed this report by repeating the blue Honda's license plate number, and the dispatcher again stated that the license plate came back as belonging to a red Honda.

Smith pulled the blue Honda over along the shoulder of Interstate 25, near an exit ramp.  Smith exited his police vehicle, approached the Honda on the driver side, and began an investigation into whether the Honda was stolen.  Smith saw that there were two male occupants in the Honda, one in the driver seat and one in the front

---

[1] We draw the following facts from the dashboard camera footage of the responding officer's vehicle, the audio from police radio dispatch, and the responding officer's declaration and deposition testimony.  We construe these facts, and draw reasonable inferences from them, in the favor of the nonmovant.  *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994); *see Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

passenger seat.  The driver identified himself as Brandon Smith.  Brandon explained that he had recently purchased the Honda and did not have the registration or proof of insurance for the vehicle.  Brandon also stated that he was aware that the license plate on the Honda belonged to a different car.  Officer Smith examined the blue Honda's Vehicle Identification Number ("VIN"), located on the Honda's driver side dashboard.  Smith saw that the last four digits of the blue Honda's VIN were 2582.

Officer Smith asked Brandon to exit the Honda, and Brandon complied.  The two interacted for about three minutes outside of the Honda.  During this time, Smith asked Brandon for the passenger's name.  Brandon answered that the passenger's name was "Johnny . . . Jonathan."  D.C.V. at 7:15–18.[2]  Brandon could not remember Johnny's last name.  Brandon also told Smith that he had known Johnny for a couple of months.  Smith directed Brandon to stay standing on the shoulder.

Smith radioed to ask for the last four digits of the VIN associated with the license plate on the blue Honda.  Dispatch responded that the last four digits of the VIN associated with that plate were 8463.  That did not match the last four digits that Smith saw inside of the Honda.

At 2:06 A.M., Smith re-approached the blue Honda, this time approaching on the passenger side.  The passenger, Molina, identified himself and provided his Social Security card to Smith.  Smith asked Molina if he had any outstanding

---

[2] "D.C.V." refers to the dashboard camera video footage from Smith's vehicle.

warrants.  Molina replied that he had an outstanding warrant for his arrest and that he had absconded from that warrant.

Smith asked Molina to exit the Honda.  Before getting out, Molina looked straight ahead and repeated, "I'm not going back to prison.  I'm not going back to prison."  App'x Vol. I at 74, 210.  Smith then again asked Molina to exit the car.  Molina opened the door and began to quickly get out of the car while leaning forward.  Smith saw Molina clench his muscles and pull his legs underneath him, as if to gain leverage.  Molina managed about one step out of the car before Smith grabbed Molina and pushed Molina back into the car.

A physical struggle ensued between Smith and Molina.  The struggle began with Molina in the front seat and Smith standing just outside of the passenger side of the car, and then it moved largely out of sight of the dashboard camera's view as Smith moved into the car with Molina.  *See* D.C.V. at 9:48–11:15.

At the start of the struggle, Smith pulled out his handcuffs and tried to restrain Molina.  Smith also warned Molina, "I'll f*cking tase your ass."  *Id.* at 9:53–55.  The pair struggled for about 23 seconds.  Molina swung his arms around, and he knocked the handcuffs out of Smith's hands.  Smith punched Molina in the head at least twice.

At some point during the struggle, Smith heard a "boom" and felt a pain in his leg.  Smith had been shot in his left hip by a .25 caliber pistol, a gun which was not his.  Smith then tried to gain control of Molina's hand, and when he did, Smith saw the muzzle of a gun.  Though Smith saw the gun in Molina's hand at some point

4

during the struggle, Smith did not see the .25 pistol go off, nor did he see Molina pull the trigger.

The struggle then moved inside the Honda, and it stayed there for just over a minute. *See id.* at 10:12–11:15. During that time, Molina reached his hand toward Smith's holstered police-issued firearm, and, at some point, Molina managed a grip on Smith's (still-)holstered weapon. Molina also yelled for Brandon to come back to the Honda. On the dashboard camera video, Molina's foot twice can be briefly seen sticking out of the car, *id.* at 10:49, 11:00, then Smith's head emerges from the car, *id.* at 11:07, and then Molina's foot and leg extend out of the car, *id.* at 11:11. As the two scuffled, Smith bit down on Molina's arm, which caused Molina to lose his grip on Smith's holstered gun. Molina screamed, and he bit Smith's left shoulder. Following Molina's bite, Smith fully exited the Honda. As Smith exited the Honda, Molina's hand emerged from the car and reached toward Smith's holstered police-issued firearm. *Id.* at 11:11–13.

Smith unholstered his firearm as he exited the Honda. Once out of the car, Smith pointed his gun at Molina, who was still in the car, and Smith fired his gun toward Molina's chest. After the gunshot, Molina loudly groaned.

After that shot, Smith quickly moved away from the Honda's passenger door, which remained open. Both Molina and the .25 pistol were still in the Honda. Smith's gun malfunctioned, and it took Smith four seconds to clear it. Once he cleared the malfunction, Smith pointed his weapon in the direction of Molina and yelled, "put your f*ckin' hands in the air, b*tch!" *Id.* at 11:18–20. Then Smith

5

quickly moved to the back of the Honda, near his patrol car, with his gun pointing toward the Honda's back windshield.  From that position, Smith could not see any part of Molina's body other than his feet.  Smith could not see Molina's hands, nor did Smith see or know where exactly in the car the .25 handgun was.  The back window's tint kept Smith from being able to see Molina through that window.

Right after Smith ordered Molina to put his hands up and moved to the back of the Honda, Molina's foot and lower leg quickly jutted out from the passenger door.  Then, Smith immediately fired seven shots in rapid succession at Molina, starting through the rear window and then, as Smith circled to his right, at an angle through the passenger door.  Molina screamed.

About eight seconds passed from Smith's first shot to Smith's second round of shots.  About three seconds elapsed between Smith ordering Molina to put his hands in the air to Smith's second round of shots.

After firing the second round of shots, Smith ordered Molina to place his hands in the air and exit the Honda.  Smith radioed dispatch informing that he was hit, shots were fired, the suspect was down, and an ambulance was needed.  Smith then retrieved his medical bag and administered first aid to Molina.  Molina died at the scene.

**B.**

Salgado filed suit on behalf of Molina in New Mexico state court against Smith, the New Mexico Department of Public Safety, and three John Doe defendants.  As relevant to this appeal, one of Salgado's claims was a Fourth Amendment

6

excessive force claim under § 1983 against Smith for the shooting.  The defendants

removed the case to the United States District Court for the District of New Mexico

based on federal question jurisdiction.

Smith moved for summary judgment on the excessive force claim, invoking

qualified immunity.  The district court granted the motion.  The court held that

(1) Smith did not use excessive force under the circumstances and (2) Smith did not

violate clearly established law.  The district court entered final judgment in Smith's

favor.

Salgado timely appealed.

## II.

We review the district court's grant of summary judgment de novo.  *Lance v.*

*Morris*, 985 F.3d 787, 793 (10th Cir. 2021).  Summary judgment is appropriate where

"there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We consider the facts in the

light most favorable to the nonmovant and draw all reasonable inferences in the

nonmovant's favor.  *Lance*, 985 F.3d at 793.  "In qualified immunity cases, this

generally means adopting the plaintiff's version of the facts; however, we do not

have to accept versions of the facts contradicted by objective evidence, such as video

surveillance footage."  *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023)

(brackets and internal quotation marks omitted).

Public officials are entitled to qualified immunity unless they (1) violated a

constitutional or statutory right which (2) was clearly established at the time of the

official's conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see Palacios*, 61 F.4th at 1256. When a defendant asserts the qualified immunity defense at summary judgment, the plaintiff bears the burden to establish both prongs. *Palacios*, 61 F.4th at 1256. We may address the two prongs in either order. *Pearson*, 555 U.S. at 236.

## III.

We find it appropriate in this case to proceed directly to the second prong of qualified immunity—whether the right was clearly established. We hold that Smith did not violate Molina's clearly established rights. As a result, Smith is entitled to qualified immunity.

## A.

A right is clearly established if, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *Hemry v. Ross*, 62 F.4th 1248, 1253 (10th Cir. 2023) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). The "law must be 'settled,'" meaning, there must be "a Supreme Court or Tenth Circuit published decision, or a 'robust consensus of cases of persuasive authority,' [that] made clear the unconstitutionality of" the defendant's conduct "at the time of the incident." *Lewis v. City of Edmond*, 48 F.4th 1193, 1198 (10th Cir. 2022) (quoting *Wesby*, 583 U.S. at 63). "It is the [plaintiff's] burden to identify a case that establishes that 'every reasonable official' would have understood" that the

8

challenged conduct violated the law. *Hemry*, 62 F.4th at 1258 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The "clearly established" standard requires that the law clearly prohibit the defendant's "conduct in the particular circumstances before him." *Wesby*, 583 U.S. at 63. This "requires a high degree of specificity."[3] *Id.* (internal quotation marks omitted); *see Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (citation and internal quotation marks omitted)).

Specificity in the law "is particularly important in excessive force cases." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam). This is "because circumstances that are 'tense, uncertain, and rapidly evolving' often force police officers to make 'split-second judgments . . . about the amount of force that is necessary in a particular situation.'" *Lewis*, 48 F.4th at 1198 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "Claims of excessive force turn 'very much on the facts of each case,' and a police officer is entitled to qualified immunity unless existing prior precedent 'squarely governs' the specific facts at issue." *Id.* at 1199 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)).

---

[3] There can be "the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 583 U.S. at 64 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). Salgado never argues that this is such a case, and we do not independently find it to be so.

**B.**

Salgado challenges the district court's determination that Smith did not violate clearly established law by firing a second round of shots at Molina eight seconds after Smith fired a first shot at Molina's chest,[4] where Smith ordered Molina to put his hands up, Smith could not see Molina's body except his feet, Smith saw Molina's feet jut quickly out of the car, Smith knew Molina was in a car that had a gun inside it, and Smith had just been shot in the leg by that gun. Salgado argues that Smith's conduct violated the clearly established principle that the "use of deadly force is unreasonable when a reasonable officer would have perceived that the threat had passed." Aplt. Br. at 19 (quoting *Reavis Est. of Coale v. Frost*, 967 F.3d 978, 989 (10th Cir. 2020)).

For support, Salgado relies primarily on our decision in *Fancher v. Barrientos*, 723 F.3d 1191 (10th Cir. 2013).[5] In *Fancher*, the officer, responding to a report of stolen beer, fired his weapon into the suspect's chest after the suspect took control of the officer's still-running patrol vehicle that the officer had left to pursue the suspect on foot. *Id.* at 1194–98. After the first shot, the officer saw the suspect slump. *Id.* at

---

[4] On appeal, Salgado does not argue that Smith's first shot at Molina violated Molina's clearly established constitutional rights.

[5] Below and initially on appeal, Salgado also placed great reliance on our decision in *Estate of Smart v. City of Wichita*, 951 F.3d 1161 (10th Cir. 2020). But Smith shot and killed Molina in 2018, and we decided *Smart* in 2020. Therefore, *Smart*, "decided after the shooting at issue, is of no use in the clearly established inquiry" in this case. *City of Tahlequah v. Bond*, 595 U.S. 9, 13 (2021) (per curiam). The same goes for our decision in *Reavis*, though Salgado only cites *Reavis* as evidence of the law Salgado says *Fancher* clearly establishes.

1196–97. The officer testified that after the first shot, he stepped away from the vehicle and "felt safer" before firing at the suspect six more times. *Id.* at 1197. We explained that the officer fired six shots into a suspect that was no longer able to control the patrol vehicle, escape, or fire the long guns located inside the vehicle. *Id.* at 1201. Prior to his additional shots, the officer stepped back, felt safer, and noticed the suspect had slumped. *Id.* This provided the officer enough time to recognize and react to the changed circumstances and cease firing. *Id.*

Salgado also cites *McCoy v. Meyers*, 887 F.3d 1034 (10th Cir. 2018), and *Perea v. Baca*, 817 F.3d 1198 (10th Cir. 2016). In *McCoy*, officers continued beating and employing a carotid restraint on a suspect "after [the suspect] was rendered unconscious, handcuffed, and zip-tied" and was only just beginning to regain consciousness. 887 F.3d at 1051–52. In *Perea*, officers continued tasing a suspect whom they had "effectively subdued" by "get[ting him] on the ground on his stomach, with both officers on top of him." 817 F.3d at 1201, 1204.

But the facts of this case are meaningfully distinguishable from those cases. In those cases, "the suspect had *clearly* been subdued . . . , making continued use of deadly force plainly unjustifiable." *See Lewis*, 48 F.4th at 1200. But here, Smith had reason to think that Molina was not subdued. Video evidence shows, and neither party disputes, that although Smith had shot at Molina once already, Molina quickly kicked his leg out of the passenger-side door just before the second round of shots. And it is likewise undisputed that before he fired the second round of shots, Smith could not see Molina's body other than his feet. This additional, post-initial-restraint

11

movement did not occur in the cases Salgado cites. This distinction also holds with our other published excessive-force cases that we have uncovered in our independent study. *See Emmett v. Armstrong*, 973 F.3d 1127, 1136, 1138–39 (10th Cir. 2020) (concluding that officer violated clearly established law by tasing suspect who "was lying on his back on the ground, visibly relaxed, laughing, and had ceased any active resistance"); *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (affirming order denying summary judgment for officers who used "force adequate to tear a tendon . . . against a fully restrained arrestee"); *Weigel v. Broad*, 544 F.3d 1143, 1152–53 (10th Cir. 2008) (reversing grant of qualified immunity to officers as to use of force against suspect after suspect "was handcuffed and his legs were bound" and one officer reported to dispatch that the suspect was under control); *Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (holding that force used against "a citizen peacefully attempting to return to the courthouse with a file" violated clearly established law); *Carr v. Castle*, 337 F.3d 1221, 1225, 1227 (10th Cir. 2003) (affirming order denying qualified immunity to officers that fired fatal shot at decedent when he "had his head near the ground with his buttocks slightly elevated"); *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991) (concluding that officer violated clearly established law by striking individual who "had already been frisked, had his hands up against [a] van with his back to the officers, and was not making any aggressive moves or threats").

For these reasons, Salgado has not met her burden to supply a Supreme Court or Tenth Circuit case clearly establishing that Smith's conduct amounts to a

12

constitutional violation.[6]  And after our independent review of the caselaw, "we cannot 'identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment'" either.  *See Hemry*, 62 F.4th at 1260 (quoting *Wesby*, 583 U.S. at 64).  We thus cannot say that "existing prior precedent 'squarely governs' the specific facts at issue" here, *Lewis*, 48 F.4th at 1199 (quoting *Kisela*, 584 U.S. at 104), and places the unconstitutionality of Smith's conduct "beyond debate," *Hemry*, 62 F.4th at 1253 (quoting *Wesby*, 583 U.S. at 63).  Consequently, Smith is entitled to qualified immunity.

**IV.**

For the foregoing reasons, we AFFIRM.

Entered for the Court

Allison H. Eid
Circuit Judge

---

[6] It therefore makes no difference if, as Salgado suggests, factual disputes remain about whether (1) Molina indeed was *actually* subdued after the first shot and (2) Molina's additional movement was an attempt to flee.  Even if resolving those purported disputes in Salgado's favor would establish a constitutional violation on the first qualified immunity prong, it would not remedy the shortcoming on the second prong to provide Supreme Court or Tenth Circuit precedent showing that such a constitutional violation was clearly established.

13