**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 4, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MERLINDA PEREA; FRANCINE
PUENTES, as co-personal representatives
of the estate of Jerry Perea, and on behalf
of the minor, B.P.,

     Plaintiffs - Appellees.

v.

APD OFFICER DAVID BACA; APD
OFFICER ANDREW JARAMILLO,

     Defendants - Appellants,

and

CITY OF ALBUQUERQUE;
ALBUQUERQUE CITY POLICE,

     Defendants.

No. 14-2214

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:13-CV-00263-RB-RHS)**
_____

Stephanie M. Griffin, Deputy City Attorney, City of Albuquerque Legal Department,
Albuquerque, New Mexico, for Defendants-Appellants.

Santiago E. Juarez, Albuquerque, New Mexico (Cheryl K. McLean, Albuquerque, New
Mexico, with him on the briefs), for Plaintiffs-Appellees.
_____

Before **LUCERO**, **HARTZ**, and **GORSUCH**, Circuit Judges.
_____

**LUCERO**, Circuit Judge.

_____

Jerry Perea died in 2011 after an incident involving Officers David Baca and Andrew Jaramillo. The district court denied Baca and Jaramillo qualified immunity against a Fourth Amendment excessive force claim, and they appealed. We hold that the officers' repeated tasering of Perea after he was subdued constituted excessive force, and that it was clearly established at the time of the taserings that such conduct was unconstitutional. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

On interlocutory appeal from the denial of qualified immunity, "we take, as given, the facts that the district court assumed when it denied summary judgment." Morris v. Noe, 672 F.3d 1185, 1189 (10th Cir. 2012) (quotation omitted). Thus, we "rely on the district court's description of the facts, taken in the light most favorable to Plaintiff, and do not reevaluate the district court's conclusion that the . . . record is sufficient to prove these facts." Al-Turki v. Robinson, 762 F.3d 1188, 1191 (10th Cir. 2014). The facts as stated by the district court are as follows.

On March 21, 2011, Merlinda Perea called 911 and told the operator that her son, Perea,[1] was on "very bad drugs" and that she was afraid of what he might do. Around the same time, a neighbor also called 911, reporting that Perea was pacing in his yard, clutching a Bible, and asking forgiveness of a higher power. Baca and

_____

[1] For clarity, we refer to Jerry Perea as "Perea" and Merlinda Perea as "Merlinda Perea."

Jaramillo were sent to perform a welfare check. The officers were informed that they were responding to a verbal fight and that no weapons were involved. They were also informed that Perea suffered from mental illness and may have been on drugs.

Upon arrival at the home, the officers were told that Perea recently left on his bicycle, that he was "acting up," and that Merlinda Perea was afraid for Perea's welfare. In separate patrol cars, Baca and Jaramillo began to search for Perea in case he was a danger to himself. The officers located Perea pedaling his bicycle. Perea saw the patrol car and began to pedal faster, at which point Jaramillo turned on his emergency lights. According to Baca, Perea did not stop, and instead pedaled through a stop sign without slowing down.

The officers used their patrol cars to force Perea to pedal into a parking lot. Jaramillo left his vehicle to pursue Perea on foot. After a brief chase, Jaramillo pushed Perea off his bicycle. The officers did not tell Perea why they were following him or why he was being seized, and they never asked Perea to halt or stop. After pushing Perea off his bicycle, Jaramillo reached for Perea's hands in an attempt to detain him. Perea struggled and thrashed while holding a crucifix.[2] After Perea began to struggle, Baca told Jaramillo to use his taser against Perea.

Jaramillo complied and first shot Perea in the chest with his taser on "probe" mode. Probe mode is used to subdue an intended target through electric shocks

_____

[2] The record is silent regarding the size or import of the crucifix, except that Jaramillo at first could not discern what object was in Perea's hand. Regardless, the district court determined that possessing the crucifix did not amount to being "armed."

designed to cause immobility. When the initial shot proved ineffective, Jaramillo put the taser in "stun" or "contact" mode, which is used to gain the target's compliance through the administration of pain. Jaramillo tasered Perea nine additional times, for a total of ten taserings in less than two minutes. At some point before the taserings stopped, Baca and Jaramillo were able to get Perea on the ground on his stomach, with both officers on top of him, effectively subduing him. After the taserings had concluded, Baca called an ambulance and a field supervisor to the scene as required by the Albuquerque Police Department taser policy.

While waiting for the ambulance, the officers noticed that Perea had stopped breathing and was turning gray. The officers successfully performed CPR, and Perea began to breathe normally. However, when Perea heard the sirens from the approaching ambulance, he began to struggle and started to scream and ask God for forgiveness. Upon arrival, the paramedics attempted to treat and calm Perea, but he stopped breathing again and his pulse stopped. Perea was transported to the hospital and pronounced dead a short time later.

Appellees, representing Perea's estate, filed suit against Baca, Jaramillo, the Albuquerque Police Department, and the City of Albuquerque. As relevant to this appeal, Appellees alleged excessive force against the officers for pushing Perea off his bicycle and for tasering him ten times. Baca and Jaramillo moved for summary judgment based on qualified immunity. The district court granted qualified immunity as to the bicycle-related claim, but denied it as to use of the taser. Baca and Jaramillo timely appealed the denial of qualified immunity.

## II

We have jurisdiction over an appeal from the denial of qualified immunity only "[t]o the extent [the] appeal turns on an abstract issue of law," Roosevelt-Hennix v. Prickett, 717 F.3d 751, 753 (10th Cir. 2013). We review those issues de novo. Morris, 672 F.3d at 1189. As noted supra, we "rely on the district court's description of the facts, taken in the light most favorable to Plaintiff, and do not reevaluate the district court's conclusion that the . . . record is sufficient to prove these facts." Al-Turki, 762 F.3d at 1191.

Appellants' assertion of qualified immunity creates a presumption that they are immune from suit. See Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc). To overcome this presumption, Appellees must show that (1) the officers' alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that "every reasonable official would have understood," that such conduct constituted a violation of that right. Mullenix v. Luna, 136 S. Ct. 305, 308 (2015).

We first determine whether the officers' repeated tasering of Perea after he had been subdued constitutes a violation of the Fourth Amendment right to be free of excessive force. Holding that it does, we then consider whether it was clearly established, at the time of the violation, that such conduct was unconstitutional. Because it is clear from this circuit's precedent that using disproportionate force, in this case a taser, against a subdued misdemeanant is a violation of the Fourth Amendment, we affirm the denial of qualified immunity.

-5-

## A

We evaluate excessive force claims under an objective reasonableness standard, which we judge from the perspective of a reasonable officer on the scene. Graham v. Connor, 490 U.S. 386, 396-97 (1989). To determine if an officer's actions were objectively reasonable, we carefully consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. An "[a]ssessment of the degree of force actually used is critical to the question of whether the force was excessive." Grauerholz v. Adcock, 51 F. App'x 298, 300 (10th Cir. 2002) (unpublished) (citing Tennessee v. Garner, 471 U.S. 1, 8-9 (1985)).

The first factor we consider, the severity of Perea's crime, weighs heavily against the use of anything more than minimal force. That the officers were performing a welfare check, and that they were not looking for him because they suspected he had committed a crime prior to finding him, weighs heavily against the use of significant force. Cf. Fisher v. City of Las Cruces, 584 F.3d 888, 895 (10th Cir. 2009) (noting that detainee's commission of a petty misdemeanor weighed in favor of using minimal, if any, force). Nevertheless, the officers saw Perea violate Albuquerque traffic ordinances by pedaling through a stop sign, which they argue justified using force to effect Perea's arrest. See Atwater v. City of Lago Vista, 532 U.S. 318, 322 (2001) (officers may arrest suspect for misdemeanor traffic violation); Gross v. Pirtle, 245 F.3d 1151, 1158 (10th Cir. 2001) ("[O]fficers may use some

degree of physical coercion . . . to effect" an arrest.). Although the officers are correct that an officer can effect an arrest for even a minor infraction, Perea's minor offense—at most—supported the use of minimal force. See Fogarty v. Gallegos, 523 F.3d 1147, 1160 (10th Cir. 2008) (because detainee had committed only a petty misdemeanor, "the amount of force used should have been reduced accordingly"). Instead, the officers used a taser against Perea ten times in two minutes. Repeated use of the taser exceeded the minimal force that would be proportional to Perea's crime. Thus, the first Graham factor weighs in Perea's favor.

The second factor, whether Perea posed an immediate threat to the safety of the officers or others, similarly weighs against the officers. The officers do not argue that Perea was a danger to anyone other than himself before they attempted to effect an arrest. After that point, any threat posed stemmed from Perea resisting arrest after the officers pushed him from his bicycle without warning or explanation. His physical reaction to an unexplained arrest is properly considered under the third Graham factor. Because the officers do not argue that Perea posed a threat before they initiated the arrest, the second Graham factor weighs in Perea's favor.

The third factor, whether Perea resisted arrest, weighs in favor of the use of some force during the period in which Perea was resisting. However, the relevant inquiry is whether the taser use was reasonable and proportionate given Perea's resistance. Cortez, 478 F.3d at 1126 ("[T]he excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case."). Perea's

resistance (thrashing and swinging a crucifix) did not justify the officers' severe response. Perea was pushed off of his bicycle by police and then tasered repeatedly without explanation. Though some force would be justified to get Perea under the officers' control, the district court determined that a reasonable jury could find that Jaramillo continued to use the taser on Perea even after the point where it could be considered necessary or even debatably reasonable. Although use of some force against a resisting arrestee may be justified, continued and increased use of force against a subdued detainee is not. See Dixon v. Richer, 922 F.2d 1456, 1463 (10th Cir. 1991). As the district court concluded:

> [T]he situation was not static over the course of the ten taserings. When Officer Jaramillo first engaged the Taser, he shot Mr. Perea in the chest. At the time, Mr. Perea was trying to ward off the officers with his crucifix. . . . At some point, however, Mr. Perea fell and the officers pushed him to the ground with his arms under his body. One officer was on 'the upper part of his body' while the second officer was on his legs. Officer Jaramillo continued to taser Mr. Perea in the back again and again until he pulled his arms out and handcuffed both hands.

The officers tasered Perea once in "probe mode" and nine times in "stun mode" within the span of two minutes, continuing after Perea had been effectively subdued. Even if Perea initially posed a threat to the officers that justified tasering him, the justification disappeared when Perea was under the officers' control. It is not reasonable for an officer to repeatedly use a taser against a subdued arrestee they know to be mentally ill, whose crime is minor, and who poses no threat to the

-8-

officers or others.[3] Because the officers repeated use of the taser cannot be described as reasonable, at least after the point Perea was subdued, the third Graham factor weighs against the officers.

Viewing the facts as stated by the district court in the light most favorable to Appellees, Jaramillo and Baca's actions were objectively unreasonable. Perea was tackled to the ground for—at most—a traffic infraction. He posed no threat to the officers or others until the officers initiated the arrest. The officers then tasered him repeatedly despite not explaining what they were doing or why they were attempting to subdue him. Most egregiously, they continued tasering Perea after he was effectively subdued and brought under the officers' control. The repeated use of the taser against a subdued offender is clearly unreasonable and constitutes excessive force under the Fourth Amendment.

**B**

Having concluded that the officers' conduct violated the Fourth Amendment, we next address whether—at the time of the events of this case—it was clearly established that the officers' actions constituted excessive force. It is clearly established that specific conduct violates a constitutional right when Tenth Circuit or Supreme Court precedent would make it clear to every reasonable officer that such conduct is prohibited. Mullenix, 136 S. Ct. at 308; Cavanaugh v. Woods Cross City,

_____

[3] Baca and Jaramillo argue that the district court erred in finding that Perea was effectively subdued. We do not have jurisdiction to "reevaluate the district court's conclusion that the . . . record is sufficient to prove" that he was subdued. Al-Turki, 762 F.3d at 1191.

625 F.3d 661, 666 (10th Cir. 2010). However, the qualified immunity analysis involves more than "a scavenger hunt for prior cases with precisely the same facts." Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." Id. The Supreme Court has cautioned circuit courts "not to define clearly established law at a high level of generality," but to focus on "whether the violative nature of particular conduct is clearly established." Mullenix, 136 S. Ct. at 308.

It is—and was at the time of Perea's death—clearly established law in the Tenth Circuit that the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force. Fogarty, 523 F.3d at 1160; Casey, 509 F.3d at 1281, 1285 (use of force, including a taser, against a suspect who committed only a nonviolent misdemeanor, and who did not struggle against officers until the officers employed force, was unlawful). More specifically, it is likewise clearly established that officers may not continue to use force against a suspect who is effectively subdued. See, e.g., Fancher v. Barrientos, 723 F.3d 1191, 1201 (10th Cir. 2013) (although a single shot by an officer may have been justified, the following six shots were clearly unlawful because they occurred after arrestee no longer posed a threat of serious harm); Dixon, 922 F.2d at 1463 (continuing to strike detainee after he had been subdued was clearly unconstitutional); Herrera v. Bernalillo Cty. Bd. of Cty. Comm'rs, 361 F. App'x 924, 929 (10th Cir. 2010) (unpublished) (use of force against

-10-

detainee who officers initially believed would flee, but who demonstrated that further flight was unlikely, was clearly excessive); Gouskos v. Griffith, 122 F. App'x 965, 977 (10th Cir. 2005) (unpublished) (officer's continued use of force against a subdued arrestee precluded qualified immunity).[4] The district court determined that there was sufficient evidence in the record for a reasonable fact finder to conclude that the officers continued to taser Perea after he was subdued. And our precedent is clear that continued use of force after an individual has been subdued is a violation of the Fourth Amendment. We must accordingly conclude that continuing to taser Perea, a subdued misdemeanant, violated clearly established law.

---

[4] Appellants cite cases holding that the use of a taser against misdemeanants did not violate clearly established law. See, e.g., Hinton v. City of Elwood, 997 F.2d 774, 781 (10th Cir. 1993) (use of taser multiple times was justified against an arrestee who was "actively and openly resisting"). They also observe that there is no authority specifically holding that using a taser against an individual ten times in two minutes is unlawful. Appellants are correct that we have never held that use of a taser, in and of itself, constitutes excessive force. But disproportionate use of a taser, and repeated use of a taser against an effectively subdued individual, are clearly established constitutional violations. Although we are deeply troubled by the sheer number of times the officers deployed the taser in under two minutes, we do not set a specific limit on the number of times an arrestee may be tased within a given time interval. We simply affirm the district court holding that, under our precedent, no reasonable officer could conclude that continuing to taser a subdued detainee is constitutional.

-11-

**III**

The judgment of the district court is **AFFIRMED**.