**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 18, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

HERMELINDA ALVARADO-
ESCOBEDO, as personal representative of
the estate of Edgar Camacho-Alvarado,
deceased, and as natural mother of A.M.,
and I.M., minors,

      Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA; PAUL
HERNANDEZ, individually and in his
official capacity as Deputy United States
Marshal,

      Defendants - Appellees.

No. 19-2048
(D.C. Nos. 1:16-CV-01235-NF-MLC,
1:18-CV-00169-NF-MLC)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **PHILLIPS**, and **CARSON**, Circuit Judges.
_____

Plaintiffs are the mother and siblings of Edgar Camacho-Alvarado (Camacho).

On February 20, 2016, Camacho was shot and killed by defendant Paul Hernandez, a

Deputy United States Marshal. Plaintiff Hermelinda Alvarado-Escobedo, Camacho's

---

[*]   After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

mother and personal representative, brought a wrongful death claim against the United States under the Federal Tort Claims Act (FTCA) and an action against Hernandez under *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In a separate action, plaintiffs asserted claims for loss of consortium under the FTCA and New Mexico state law. The district court consolidated the cases and granted summary judgment to the defendants on all claims. Plaintiffs appeal. We affirm.

## BACKGROUND

We recount the facts in the light most favorable to the plaintiffs, the non-moving parties, in our summary-judgment review. *See Davis v. Clifford*, 825 F.3d 1131, 1133 (10th Cir. 2016).

### The Investigation

On February 19 and 20, 2016, the Southwest Investigative Fugitive Task Force (SWIFT) was attempting to apprehend a fugitive named George Bond in Albuquerque, New Mexico. Hernandez was the lead investigator on the case. Law enforcement officials believed that Bond, who was wanted for murder, was armed and dangerous and was working with several criminal associates.

At approximately 12:30 a.m. on February 20, investigative techniques led SWIFT to believe that Bond was located at a trailer park in Albuquerque. Hernandez and his team initially conducted surveillance from outside the trailer park. Then, later that morning, Hernandez entered the trailer park. He proceeded on foot and in

2

plain clothes, seeking to maintain a covert presence while gathering intelligence concerning Bond's potential location.

**Hernandez Encounters Camacho; The Shooting**

At approximately 3:30 a.m. Hernandez was near the southern end of the trailer park when he observed Camacho standing near the middle of the trailer park. Although Hernandez could not see Camacho's face, he could tell from what he knew of Bond's description that he was not Bond.

Camacho stood for a moment, looking around to the north and to the south. Hernandez was concerned he might be engaged in counter-surveillance. Hernandez began to walk away, unsure if Camacho had seen him. When he turned around, he observed Camacho walking directly toward him.

As Camacho approached him, Hernandez attempted to make small talk. Camacho responded with only curt responses that indicated to Hernandez that he did not want to talk to him. Camacho walked directly up to Hernandez and stopped approximately six to eight feet in front of him.

According to Hernandez, Camacho stared at him for a few seconds without saying anything. Then he took out a cell phone and appeared to be making a call. While still on the phone, Camacho asked Hernandez, "[W]hat are you doing here?" Aplt. App., Vol. VI at 1702 (internal quotation marks omitted). Hernandez replied "with something like '[W]hat the hell does it matter to you.'" *Id.*

The only living witness to the shooting, Hernandez was deposed, and, based on his deposition responses, the United States reported the following facts as being undisputed:[1]

> Deputy Hernandez observed Camacho-Alvarado attempt to pull his hand out his hoodie pocket and saw that Camacho-Alvarado was holding a gun. Deputy Hernandez yelled, "Police! Don't move!" as loud as he could and drew his own firearm. Deputy Hernandez then observed Camacho-Alvarado successfully draw the gun from his right hoodie pocket. At this point, Deputy Hernandez and Camacho-Alvarado were as close as 4 or 5 feet apart.

> Camacho-Alvarado ignored Deputy Hernandez's command and turned and ran north, further into the trailer park, with his weapon in hand. Deputy Hernandez ran after Camacho-Alvarado and again yelled, "Police!"

> . . .

> During the pursuit, Deputy Hernandez could see the firearm in Camacho-Alvarado's hand. The pursuit lasted approximately 8 seconds.

> Camacho-Alvarado turned left by trailer 26 [where he and his mother lived] and Deputy Hernandez briefly lost sight of him. After a second or maybe a couple of seconds, Deputy Hernandez observed movement to his left and saw Camacho-Alvarado to his west, near the front door of trailer 26.

> As Deputy Hernandez was facing west, he observed Camacho-Alvarado moving northward from his left to his right, with his firearm pointed at Deputy Hernandez.

> Deputy Hernandez discharged his duty-issued weapon, a Glock 23 Gen 4 40 Caliber handgun, four times. He fired the shots in quick succession, within approximately one second, until he lost sight of Camacho-Alvarado.

---

[1] Plaintiff Hermalinda Alvarado-Escobedo, Camacho's mother, testified that she heard rapid gunshots from her bedroom in trailer 26, but she did not look outside or see anything at the time she heard the shots. Alvarado-Escobedo's boyfriend also heard shots. He approached the front door and saw Camacho fall to the ground near the door, but he did not witness the shooting.

4

Deputy Hernandez was near the southeast corner of trailer 26 when he discharged his weapon.

At that time, Deputy Hernandez was less than 30 feet and possibly as little as 20 feet away from the front door of trailer 26, where he had seen Camacho-Alvarado.

*Id.*, Vol. II at 319-21 (internal quotation marks, alterations, paragraph numbers and record citations omitted).

Plaintiffs did not dispute that this was an accurate summary of Hernandez's testimony, but they argued it was incomplete and they attempted to call his account of events into question with other evidence. *See Pauly v. White*, 874 F.3d 1197, 1218 (10th Cir. 2017) (on summary judgment, court must "look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story" (internal quotation marks omitted)). Most importantly, they disputed whether Camacho had or pointed a gun at Hernandez. We analyze plaintiffs' evidence in depth later in this decision.

**The Aftermath**

Camacho was hit once by the gunshots. A medical investigation found that the fatal bullet entered his right lateral chest near the armpit, crossed through his body and came to rest in the tissues of his left mid back.

Immediately after the shooting, Deputy Hernandez, along with two other officers who arrived at the scene, Deputies Malone and Hoyle, approached the front door of trailer 26, where they saw that Camacho had fallen in the doorway. The upper part of his body was inside the threshold of the trailer, and the lower part of his body was on the front steps.

5

Malone and Hernandez observed a gun near Camacho's body. Hoyle testified he saw something that he thought was a gun near the body, but he acknowledged it might have been something other than a gun.

Hernandez testified he recovered the gun and placed it in Task Force Officer Tim Hix's police vehicle for security. Hoyle did not see Hernandez retrieve the gun.

The New Mexico State Police later recovered a 9mm Ruger P89 with a red grip from Officer Hix's vehicle. DNA was obtained from the grip, trigger, and trigger-guard of the gun that tested positive for Camacho. The gun had previously been stolen. At the time it was stolen, it did not have a red grip. The defendants presented evidence that Camacho had owned and used red spray paint.

After the shooting, Malone and Hoyle moved Camacho from the doorway of trailer 26 to a place of cover behind the engine block of a nearby vehicle. The deputies explained that they moved Camacho because the trailer doorway represented an area of danger known as the "fatal funnel . . . where altercations could potentially happen" and law enforcement officers or bystanders could "get hurt or hit." Aplt. App., Vol. II at 323 (internal quotation marks omitted). Plaintiffs complain, based on their expert's report, that dragging Camacho away from the doorway "had a detrimental effect on trace evidence in the clothing, which affected the ballistics analysis in this case." *Id.*, Vol. V at 1228.

## ANALYSIS

Our summary judgment standard of review is well established:

> We review the grant of summary judgment de novo. We view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. Summary judgment is appropriate only if there is no genuine dispute as to any material fact. A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."

*Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015) (citations and internal quotation marks omitted).

### *Bivens* **Claim**

The district court granted summary judgment in favor of Hernandez based on qualified immunity. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted). A *Bivens* defendant's assertion of this affirmative defense "creates a presumption that [the defendant is] immune from suit." *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016). To overcome that presumption, the plaintiff "must show that (1) the [officer's] alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right." *Id.* (internal quotation marks omitted). The district court found that plaintiffs had failed to raise a

7

genuine issue of material fact concerning whether Hernandez violated Camacho's constitutional rights.

Plaintiffs asserted a Fourth Amendment excessive force claim. Such claims are evaluated "under an objective reasonableness standard, which we judge from the perspective of a reasonable officer on the scene." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). "To determine if an officer's actions were objectively reasonable, we carefully consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotation marks omitted). "[O]fficers are not justified in using deadly force unless objectively reasonable officers in the same position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1213-14 (10th Cir. 2019).

Plaintiffs concede that if a "jury found that [Camacho] was armed and pointed a firearm at . . . Hernandez, then obviously . . . Hernandez was privileged to use deadly force against . . . [Camacho]." Reply Br. at 5. The district court concluded that, considering the facts as Hernandez recounted them, his use of force was reasonable. It noted that "[o]nce Camacho pulled a weapon and refused Deputy Hernandez's instruction not to move, Deputy Hernandez had probable cause to believe that Camacho posed a serious threat of physical harm to others in the trailer park justifying [his] pursuit of Camacho," and that "Deputy Hernandez did not use

8

force until Camacho pointed his gun at [him]." Aplt. App., Vol. VI at 1688. The district court opined that plaintiffs "offer[ed] nothing other than speculation to dispute Hernandez's version of events and the evidence" which was "not sufficient to overcome summary judgment." *Id.* at 1694.

In their appellate briefing plaintiffs identify three areas of factual dispute that they contend should have precluded summary judgment. They argue that material factual disputes exist concerning whether: (1) Hernandez could identify the person he was shooting at; (2) Camacho was aiming a gun when Hernandez shot him, thus posing a deadly threat; and (3) Camacho even possessed a gun when he was shot. *See* Aplt. Opening Br. at 16-18. Not every factual dispute, however, prevents the entry of summary judgment. We address plaintiffs' contentions below.

### 1. Hernandez's Identification of Camacho

Plaintiffs complain that because it was dark at the time of the shooting, and because Hernandez twice "lost his visual" of Camacho—during the pursuit and as he fired the final round at him—he "shot a man he could not see or identify." Aplt. Opening Br. at 16. They contend a genuine issue of material fact exists concerning whether Hernandez reasonably believed that he was shooting at the same person he had encountered seconds earlier—the person who had refused his instruction not to move and had drawn a weapon.

Plaintiffs' assertion that Camacho may not have been the same person who originally confronted Hernandez with a handgun is purely speculative and therefore cannot preclude summary judgment. Plaintiffs point to no evidence to suggest that

9

there was a second man at the trailer park carrying a firearm whom Hernandez initially encountered. Although Hernandez briefly lost direct visual contact with Camacho during the pursuit, he regained visual contact a couple of seconds later. *See* Aplt. App., Vol. V at 1266. The point at which he reacquired visual contact was consistent with the trajectory of Camacho's flight. Hernandez testified that he could tell "where [Camacho] broke left" and that to intercept him, Hernandez "br[oke] left in what [he] believe[d] to be his exact path" and "[a]lthough [he] lost the visual of [Camacho he] knew the approximate distance." *Id.* at 1268. In addition, although it was dark, Hernandez could see that Camacho was wearing a black hoodie. The person he initially encountered was also wearing a hoodie, and although Hernandez could not recall whether that person was wearing the hood over his head, he recalled that the person extracted the firearm from the pocket of the hoodie. Hernandez testified there was no question that this person and the deceased (Camacho) were the same person.

Plaintiffs also complain that Hernandez lost visual contact with the person he was shooting at while he fired the shots. Any complaint about mistaken identity on this point would require even greater speculation than their previous theory. It would require a jury to believe that Hernandez began by shooting at an unknown third party who pointed a gun at him but then somehow hit Camacho, who had no gun, instead. Plaintiffs point to no evidence that supports such a theory.

Nor would the facts permit a jury to find it was an unreasonable use of force for Hernandez to shoot Camacho without first doing more to verify his identity.

10

Hernandez testified that when he discharged his firearm "there was no question in my mind it was the same subject based on the totality of the circumstances." *Id.*, Vol. VII at 1756. As we have seen, the evidence supports this conclusion. In any event, Hernandez acted reasonably based on the events immediately preceding the shooting. According to his testimony, Hernandez faced a split-second decision after Camacho pointed a gun in his direction, and Hernandez "thought there was an imminent threat to [his] life." *Id.* It was reasonable to respond to such a threat with deadly force. *See Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010) ("Thus, if threatened by [a] weapon . . . , an officer may use deadly force."); *see also, e.g.*, *Estate of Smart ex rel. Smart v. City of Wichita*, 951 F.3d 1161, 1177 (10th Cir. 2020) (noting that "[c]ourts are particularly deferential to the split-second decisions police must make" in situations involving deadly threats).

### 2. Issues Surrounding Camacho and the Pistol

Plaintiffs attempt to cast doubt on both Camacho's possession of and pointing of the firearm at Hernandez. Having carefully considered the evidence, we conclude that plaintiffs have failed to show that a genuine factual issue exists concerning either whether Camacho possessed a pistol or whether he pointed it at Hernandez.

### A. Camacho's Possession of the Pistol

As noted, a pistol was discovered near Camacho's body after the shooting, and there is evidence tying Camacho to this gun. Testing of swabs taken from the pistol confirmed that his DNA was on the pistol. In addition, when stolen from its prior owner the gun did not have a red grip, but at the time it was recovered at the scene

11

the grip had been spray-painted red. There was evidence that Camacho possessed and had used red spray paint at the trailer.

In response, plaintiffs presented several facts they contend created a genuine factual dispute about whether Camacho possessed a pistol. We recognize that "plaintiffs' inability to conclusively prove a negative [i.e., that Camacho did not have a gun] does not prevent their evidence from creating a genuine dispute of fact." *Estate of Smart*, 951 F.3d at 1170. Even so, plaintiffs' evidence fails to evince a genuine factual dispute here.

Plaintiffs claimed that according to Camacho's mother, Hermalinda Alvarado-Escobedo, who moved from her bedroom to the door of the trailer where Camacho's body lay after the shooting, Camacho "did not have a gun at or near him at the scene of the shooting." Aplt. App., Vol. V at 1225. But defendants cited facts that showed that by the time she first saw her son, Hernandez had already removed the weapon.[2]

Plaintiffs contended that "[l]aw enforcement officers gave three different versions of where the gun was located on [Camacho's] body." *Id.*.[3]

---

[2]  Alvarado-Escobedo testified that she arrived at her son's body within a few seconds of when she heard gunshots. But she also testified she thought it might have been 10 or 15 seconds. She admitted that her memory of the timing of events that night was poor.

[3]  Plaintiffs also cited evidence that New Mexico State Police (NMSP) diagrams did not show a gun near Camacho, and that Deputy Hoyle stated he "did not observe any gun on the doorway floor of the trailer or in the dirt." Aplt. App., Vol. V at 1225; *see also id.*, Vol. II at 391. They do not renew these arguments on appeal. In any event, this evidence does not create a genuine factual dispute. The NMSP diagrams, which depict Camacho's body removed from the trailer steps, appear to have been prepared *after* the gun had been removed from the scene. As we have

12

Deputy Malone recalled seeing a red-colored pistol "on the eastern side of [Camacho's] body," within a foot of his shoulder. *Id.*, Vol. III at 368. Deputy Hoyle saw what appeared to be a gun "kind of just in between the waist and the arm, free, it looked like." *Id.* at 391. Hernandez testified the gun was "right next to [Camacho's] right arm." *Id.* at 426. Any discrepancies in these observations, however, were minor and did not create a genuine factual dispute about whether Camacho possessed a firearm.

Plaintiffs also presented evidence that "none of [Camacho's] family members who lived with him had previously seen him in possession of a gun or gun paraphernalia or observed such items on the premises." *Id.*, Vol. V at 1238. Such evidence may be relevant to an excessive-force inquiry. *See Estate of Smart*, 951 F.3d at 1169-70 (citing "testimony from witnesses who said they . . . never knew [the decedent] to own a gun"). But its value rests on inferences that (1) if the decedent possessed a firearm, the witnesses would have noticed it; and (2) what the witnesses previously failed to observe was also absent on the relevant occasion, i.e., that the decedent did not possess a firearm when he was shot. Here, direct evidence refutes the inference plaintiffs seek to draw from the witnesses' previous failure to observe Camacho with a firearm.

---

noted, Hoyle testified he did see what appeared to be a gun in proximity to Camacho's body.

After the shooting, the New Mexico State Police obtained a search warrant for trailer 26, where Camacho resided. From Camacho's bedroom they recovered a black .380 firearm, firearm paraphernalia, a black holster, a green rifle case, body armor, and 9mm bullets. The 9mm bullets bore the same headstamp as the 9mm bullet found in the gun recovered near Camacho's body. Given this evidence, it would be unreasonable to infer from witnesses' prior failure to observe Camacho in possession of a firearm that he did not possess a firearm when he was shot.

Finally, plaintiffs complained that Hernandez removed the gun from the scene of the crime and placed it in a law enforcement vehicle rather than allowing it to be placed into evidence. They further noted that Deputy Hoyle did not see Hernandez pick up the gun from the scene and place it in the vehicle, and that Deputies Malone and Hoyle moved Camacho's body, interfering with the ballistic evidence. These facts bear little relevance to the issue of whether Camacho possessed the firearm, *unless* offered to support a theory that Hernandez planted the firearm in the vehicle or attempted in other ways to obscure the facts of the shooting. We find the district court's critique of any such "planting of evidence" theory persuasive:

> The jury would have to find that after Hernandez shot Camacho, that in a matter of seconds between the gunshot and when the other officers arrived, Deputy Hernandez somehow got possession of the Ruger 9mm with the distinctive red handle matching the spray paint in Camacho's room and on the stairs of Camacho's trailer, got Camacho's DNA on the gun, then put the gun in a secure Marshals vehicle, where it would be found later by a completely different agency investigating the shooting. Additionally, the jury would have to find that Hernandez quickly came up with this story that matched all the physical evidence at the scene. Then somehow in a matter of seconds, Hernandez relayed this story to Deputies Malone and Hoyle, so that they would know to move the body to potentially make any

14

ballistics investigation more difficult. Additionally, Hernandez then got Deputy Malone to lie under oath by testifying that he saw a gun that was a reddish color and was close to the shoulder area, or that the gun and the shoulder were in close proximity to each other. Deputy Malone also testified that he saw Hernandez grab the gun, but did not see what happened after that.

Aplt. App., Vol. VI at 1691-92 (citation omitted).

In sum, the cited facts do not create a genuine factual issue concerning whether Camacho possessed the Ruger 9mm pistol

### B. Camacho's Pointing of the Pistol

Plaintiffs also assert that even if Camacho possessed a pistol, there is a genuine issue of material fact about whether he pointed it at Hernandez. They complain that it was dark at the scene, making it difficult for Hernandez to see whether Camacho was pointing the gun at him. But a conclusory assertion that it was dark at the scene does not by itself create a genuine factual dispute about what Hernandez saw. In addition to seeing Camacho pointing the gun, Hernandez testified that he could identify obstacles around him and that there was some lighting in the area. *See* Aplt. App., Vol. VII at 1757. He also stated that he sought cover after the shooting because there was enough light in the area that he was concerned Camacho could still see him. *See id.*

Plaintiffs also cite an alleged dispute concerning the forensic evidence. One of the physicians who autopsied Camacho stated that "[t]he location of the gunshot wound, and the trajectory through the body, indicate that, with [Camacho] standing in an erect position, the right side of his body was towards the shooter, with the

15

orientation of his upper body nearly perpendicular to the shooter's orientation and also with his upper arm raised towards his front, away from his side." *Id.* at 1851. Defendants argue this statement is consistent with Hernandez's report that Camacho pointed a gun at him. But plaintiffs counter with the statement of their forensic and projectile expert, David Balash, who stated:

> Investigators conclude that the bullet wound to the victim correlates to the stated fact by Agent Hernandez that the suspect was pointing his weapon at him when he fired, however there are many other scenario[s] that allow the arm to be away from the body when the fatal bullet struck such as reaching forward, above, or backwards.

Aplt. Opening Br. at 17 (quoting Aplt. App., Vol. V at 1383).

Balash thus speculated that Camacho *could have been* reaching forward, above, or backwards at the time Hernandez shot him, rather than pointing a gun at Hernandez. Such speculation, without additional evidentiary support, does not create a genuine factual issue. The standard here is a demanding one: whether Hernandez *reasonably perceived* that Camacho posed a threat of serious physical harm to himself or others. *See Estate of Smart*, 951 F.3d at 1171 ("An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances." (internal quotation marks omitted)). Given Hernandez's testimony and the other evidence we have described, Balash's speculative testimony fails to create a genuine issue of material fact on this point. The district court properly granted qualified immunity in favor of Hernandez.

16

**FTCA Claim**

The United States may be held liable under the FTCA in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Citing New Mexico law, Plaintiffs argue that the United States is liable because Hernandez negligently shot and killed Camacho. *See, e.g.*, *Torres v. State*, 894 P.2d 386, 391 (N.M. 1995) (stating officers have "a duty to exercise that care ordinarily exercised by reasonably prudent and qualified law enforcement officers"); *cf. State v. Johnson*, 954 P.2d 79, 82-83 (N.M. Ct. App. 1997) (noting New Mexico legislature has limited use of deadly force by law enforcement officers to situations where officers have probable cause to believe they are threatened with serious harm or deadly force).[4] Plaintiffs summarize the alleged negligence as follows: Hernandez "while in plain clothes with no official indicia that would alert the residents of [the trailer park] of his status as a law enforcement officer, used lethal force against an unknown and unidentified man who posed no risk to law enforcement." Aplt. Opening Br. at 21. For the reasons we have already explained, plaintiffs have failed to identify a genuine issue of material fact that would permit a jury to conclude that Hernandez used lethal force against "an unknown and unidentified man" or that he failed to act as a reasonably prudent officer in concluding that Camacho posed a serious risk of harm to law enforcement. The district court properly granted summary judgment concerning this claim.

17

**Loss of Consortium Claims**

Plaintiffs also challenge the grant of summary judgment on their loss of consortium claims. In a brief argument they incorporate their contentions that genuine issues of material fact exist concerning whether Camacho posed a threat to law enforcement when Hernandez shot him. For the reasons we have stated, these arguments fail, and the loss of consortium claims therefore fail as well.

## CONCLUSION

We affirm the district court's grant of summary judgment.

Entered for the Court


Jerome A. Holmes
Circuit Judge